Bret A. Stone SBN 190161 BStone@PaladinLaw.com
John R. Till SBN 178763 JTill@PaladinLaw.com
PALADIN LAW GROUP® LLP
1176 Boulevard Way
Walnut Creek, California 94595
Telephone: (925) 947-5700
Facsimile: (925) 935-8488

*Counsel for Haskins*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| RICHARD E. HASKINS, *et al.*, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> CHEROKEE GRAND AVENUE LLC, *et al.*, <br><br> *Defendants.* | Case No. CV 11-05142-YGR <br><br> HASKINS' NOTICE OF MOTION AND MOTION TO STRIKE CHEROKEE'S ANSWER AND COUNTERCLAIM <br><br> DECLARATION OF BRET A. STONE IN SUPPORT THEREOF <br><br> F.R.C.P. 12(f) |
| AND RELATED CROSS ACTIONS. | |

## N O T I C E   O F   M O T I O N

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on April 3, 2012, at 2:00 p.m., or as soon thereafter as this matter may be heard in Courtroom 4 of the above-entitled Court, located at 1301 Clay Street, Oakland, California 94612, Plaintiffs and Counter-Defendants Richard E. Haskins, Arthur L. Haskins, and Estate of Arthur "Buzz" Haskins, Jr. (collectively, "Haskins") will move this Court for an order striking portions of the Answer and Counterclaim filed by Defendants and Counterclaimants Cherokee Grand Avenue LLC, Cherokee San Francisco LLC, Cherokee Investment Partners II, LP, and Cherokee Acquisition Corp.'s (collectively, "Cherokee") on January 30, 2012. Dkt. No. 18.

The motion to strike will be made on the ground that the Answer and Counterclaim should be stricken pursuant to Federal Rule of Civil Procedure 12(f) because: (1) Cherokee's assertion regarding its status as a bona fide prospective purchaser cannot succeed on the facts as plead; and (2) Cherokee's

statute of frauds defense cannot be made in good faith.

The motion to strike will be based on and supported by this notice of motion, the points and authorities below, the Declaration of Bret A. Stone, all records on file in this case, and all evidence and oral argument as may be presented at the hearing on the motion.

DATED: February 17, 2012                    PALADIN LAW GROUP® LLP

                                            /s/ *Bret A. Stone*
                                            _____
                                            Counsel for Haskins



# I. INTRODUCTION

Plaintiffs and Counter-Defendants Richard E. Haskins, Arthur L. Haskins, and Estate of Arthur "Buzz" Haskins, Jr. (collectively, "Haskins") do not want to start this litigation with uncertainty. Yet the Answer and Counterclaim filed by Defendants and Counterclaimants Cherokee Grand Avenue LLC, Cherokee San Francisco LLC, Cherokee Investment Partners II, LP, and Cherokee Acquisition Corp.'s (collectively, "Cherokee") does just that. Cherokee fails to admit an undisputed point, raises affirmative defenses that have no chance of success, and makes allegations that cannot be true. In order to avoid this motion, Haskins wrote to Cherokee requesting it amend its pleading. Declaration of Bret A. Stone in Support of Motion to Strike Answer and Counterclaim ("Stone Decl."), at ¶ 2, Exh. 1. Haskins' letter was never answered.

The crux of this motion pertains to two assertions made by Cherokee in its Answer and Counterclaim. First, Cherokee asserts that it is a bona fide prospective purchaser and therefore not liable under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Cherokee cannot possibly prevail on this argument because of Cherokee's affiliation with Fuller-O'Brien, Inc. ("Fuller-O'Brien"). Cherokee admits Fuller-O'Brien is a responsible party. Moreover, bona fide prospective purchaser defense is for parties who acquire ownership of a facility after the date of the enactment in 2002. Cherokee does not dispute that it purchased the properties in 1999.

Second, Cherokee claims a statute of frauds argument regarding its agreement to pay $402,835 towards the environmental cleanup. Cherokee relies on a follow up writing that was drafted after the oral agreement to argue that the cleanup and monitoring activities would take more than one year. But even that writing demonstrates that payment of the $402,835 was to take place right away; well within one year.

In order to avoid unnecessary confusion and costs of litigation, Haskins moves to strike the Answer and Counterclaim as discussed in detail below.

## II.  ARGUMENT

**A.      Applicable Legal Standards**

Rule 12 provides in pertinent part:

> **(f)      Motion to Strike.**  The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act:
>
> **(1)**      on its own; or
>
> **(2)**      on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Rule 12(f).  The grounds for a motion to strike must appear on the face of the challenged pleading or from matters which the court may judicially notice.  *Security & Exchange Comm. v. Sands,* 902 F. Supp. 1149, 1165 (C.D. Cal. 1995).  When ruling on a motion to strike, a court must view the challenged pleading in the light most favorable to the pleader.  *Lazar v. Trans Union LLC,* 195 F.R.D. 665, 669 (C.D. Cal. 2000); *Multimedia Patent Trust v. Microsoft Corporation,* 525 F. Supp.2d 1200, 1207 (S.D. Cal. 2007).

**B.      Cherokee cannot plead that it is a bona fide prospective purchaser.**

Paragraph 21 of Haskins' First Amended Complaint alleges:

In approximately 1999, Cherokee purchased the Fuller-O'Brien Property and took over the investigation and cleanup of the hazardous waste contamination and indemnified Fuller-O'Brien.

Cherokee's Answer to Paragraph 21 vaguely incorporates by reference its admission that it bought the property in 1999 and denies the remainder of the paragraph.  Cherokee's denial that it indemnified Fuller O'Brien flies in the face of its production of an Environmental Indemnity Agreement between the two parties.  Stone Decl., at ¶ 3, Exh. 2.  This denial is not warranted and should be stricken.

Despite the existence of the Environmental Indemnity Agreement demonstrating Cherokee's affiliation with Fuller-O'Brien, Cherokee alleges for an affirmative defense that it is a bona fide prospective purchaser:

### THIRTY-SEVENTH AFFIRMATIVE DEFENSE
(Bona Fide Prospective Purchaser)

To the extent that answering Defendants are named as parties to this action on account of their ownership or operation of a facility, they have no liability because prior to acquiring the property they conducted all appropriate inquiry, and subsequent to acquiring the property they filed all legally required notices; exercised appropriate care to stop any continuing release, prevent any threatened future release, and prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance; provided full cooperation and assistance in accessing the site; complied with and did not impede the implementation of institutional controls; were not otherwise a potentially responsible party, and had no affiliation with parties potentially liable for response costs in connection with the facility. Defendants are entitled to a complete defense under CERCLA §101(40) and 107(r), respectively 42 U.S.C. 9601(40) and 9607(r), as bona fide prospective purchasers.

Of course, Cherokee does have an "affiliation with parties potentially liable for responses costs in connection with the facility." Indeed, that Fuller-O'Brien's operations released hazardous wastes into the environment is admitted in Paragraph 19 of the Answer. Dkt. 18, ¶ 19.

Moreover, Cherokee cannot qualify as a bona fide prospective purchaser because the 2002 amendments to CERCLA adding this new defense only apply for purchases that occurred after the changes were enacted. 42 U.S.C. § 9601(20); *see also City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F.Supp.2d 1040, 1052 (D. Kan. 2003). Cherokee's purchase was in 1999. Dkt. 18, ¶¶ 6-8. Thus, Cherokee's Thirty-Seventh Affirmative Defense should be stricken.

Finally, Paragraph 8 of the Cherokee Counterclaim similarly alleges that Cherokee is a bona fide prospective purchaser. Again, this contention is not warranted given Cherokee's affiliation with Fuller-O'Brien and the 1999 purchase. Therefore, Paragraph 8 of the Counterclaim should be stricken as well.

/ / /

1    **C.**    **Cherokee cannot plead a statute of frauds defense in good faith.**

2        Haskins also moves to strike Cherokee's Twenty-Sixth Affirmative Defense asserting the statute

3 of frauds:

4                    TWENTY-SIXTH AFFIRMATIVE DEFENSE

5                        (Statute of Frauds)

6
        Plaintiffs' allegations of an oral agreement are founded upon negotiations
toward a written Remediation Cost Sharing Agreement that were undertaken between

7 the Cherokee Parties, the Haskins Parties and South San Francisco Scavenger Company
in or about 2007. The proposed agreement contained elements that were not intended

8 to be completed within one year, including long term maintenance, monitoring and
reporting that expressly was projected to require 3 to 5 years to complete following

9 completion of the workplan. The Revised Corrective Measures Workplan allegedly to
be implemented by the alleged oral agreement expressly provided that the project site

10 would be monitored for five years as required by the regulatory agencies, including the
United States Corps of Engineers and the Regional Water Quality Control Board.

11 Plaintiffs' claim of an oral agreement based on those negotiations is unenforceable
under California Civil Code Section 1624 as an agreement that by its terms is not to be

12 performed within a year from the making thereof.

13 The Remediation Cost Sharing Agreement reference contradicts Cherokee's assertion that the

14 obligation could not have been performed within one year. Rather, the proposed Remediation Cost

15 Sharing Agreement called for the parties to fully fund the work by payment to an escrow account.

16 Stone Decl., at ¶ 4, Exh. 3. Thus, while the work may have taken longer than one year, each party's

17 obligation to pay $402,835 was to occur almost immediately. Therefore, Cherokee's Twenty-Sixth

18 Affirmative Defense should be stricken.

19                        **III. CONCLUSION**

20        For the foregoing reasons, Haskins moves to strike Cherokee's answer at Paragraph 21, the

21 Twenty-Sixth Affirmative Defense, and the Thirty-Seventh Affirmative Defense.

22 DATED: February 17, 2012           PALADIN LAW GROUP® LLP

23

24                     /s/ *Bret A. Stone*
                    _____

25                     Counsel for Haskins

26

27


28

DECLARATION OF BRET A. STONE

I, Bret A. Stone, declare as follows:

1.     I am an attorney at law in good standing and licensed to practice law in all of the courts of the State of California, am partner with the law firm of Paladin Law Group® LLP, and am one of the attorneys of record for Plaintiffs and Counter-Defendants Richard E. Haskins, Arthur L. Haskins, and Estate of Arthur "Buzz" Haskins, Jr. (collectively, "Haskins") in this action. As a result of my work on Haskins' behalf, I have personal knowledge of the matters stated herein and could and would competently testify thereto if called upon to do so.

2.     A true and correct copy of a letter dated February 6, 2012 I sent to counsel for Cherokee is attached hereto as **Exhibit 1.** Despite my attempt to follow up with counsel to solicit a response via email on February 16, 2012, I have received no response.

3.     A true and correct copy of the Environmental Indemnity Agreement I received from counsel for Cherokee is attached hereto as **Exhibit 2.**

4.     A true and correct copy of the proposed Remediation Cost Sharing Agreement referenced in Cherokee's Twenty-Sixth Affirmative Defense is attached hereto as **Exhibit 3.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Santa Barbara, Santa Barbara County, California, on February 17, 2012.

/s/ *Bret A. Stone*
_____



# EXHIBIT 1



**Southern California**
21 E. Carrillo Street
Santa Barbara, CA  93101
Telephone (805) 898-9700
Facsimile (805) 880-0499

**Northern California**
1176 Boulevard Way
Walnut Creek, CA  94595
Telephone (925) 947-5700
Facsimile (925) 935-8488

## PALADIN LAW GROUP® LLP

*Generating Professional*:
Bret A. Stone, Walnut Creek Office

February 6, 2012

***Via E-Mail***

Stephen McKae
Wendel, Rosen, Black & Dean, LLP
1111 Broadway, 24th Floor
Oakland, CA 94607

      Re:    *Haskins v. Cherokee Grand Avenue LLC, et al.*,
              Case No. CV 11-05142-YGR (U.S. Dist. Ct., N.D. Cal.)

Dear Mr. McKae:

      This letter is meant to meet and confer with you regarding the Answer and Counterclaim you filed in the above-referenced case.  While we believe there are a number of facts that should have been admitted, for now we are focused on contentions relating to the bona fide prospective purchaser and statute of frauds defenses.

      **Bona fide prospective purchaser**

      You fail to admit that the Cherokee defendants took over the investigation and cleanup and indemnified Fuller-O'Brien in Paragraph 21 of the Answer.  You previously produced a copy of such an Environmental Indemnity Agreement.  This denial is not warranted.  We request that the Answer be amended to admit this contention.

      In addition, the Cherokee defendants' affiliation with Fuller-O'Brien, whom you admit is responsible for the contamination, negates your Thirty-Seventh Affirmative Defense asserting that the Cherokee defendants were bona fide prospective purchasers.  Moreover, Cherokee cannot qualify as a bona fide prospective purchaser because the 2002 amendments to CERCLA adding this new defense only apply for purchases that occurred after the changes were enacted.  *City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F.Supp.2d 1040, 1052 (D. Kan. 2003).  Cherokee's purchase was in 1999.  As there can be no legal or evidentiary support for this contention, we request you withdraw this affirmative defense.

      Finally, Paragraph 8 of the Cherokee Counterclaim similarly alleges that Cherokee is a bona fide prospective purchaser.  Again, this contention is not warranted given Cherokee's affiliation with Fuller-O'Brien and the 1999 purchase.  We, therefore, request you amend the Counterclaim to delete Paragraph 8.



**Statute of frauds**

Turning to the statute of frauds defense, you allege in your Twenty-Sixth Affirmative Defense that negotiations towards reducing the oral contract to writing contain elements that were not intended to be completed within one year. To the contrary, the proposed Remediation Cost Sharing Agreement called for the parties to fully fund the work by payment to an escrow account. Thus, while the work may have taken longer than one year, each party's obligation to pay $402,835 was to occur almost immediately. Therefore, we request that you withdraw your affirmative defense asserting the statute of frauds.

It is not our goal to cause you extra work. Rather, we believe that these amendments will save both of our clients from proving and disproving claims that have no merit. Please let me know your intentions by February 8, 2012.

Very truly yours,

By:     *Bret Stone*

Bret A. Stone
PALADIN LAW GROUP® LLP

# EXHIBIT 2

*expired in 2009*

# ENVIRONMENTAL INDEMNITY AGREEMENT

THIS ENVIRONMENTAL INDEMNITY AGREEMENT (this "**Indemnity**") is made and executed this 23rd day of June, 1999, by **Cherokee San Francisco, LLC**, a Delaware limited liability company ("**Indemnitor**"), for the benefit of **The O'Brien Corporation,** an Indiana corporation ("**Seller**"), whose address is 2483 Old Middlefield Way, Suite 103, Mountain View, California 94040, Attn: Jerome J. Crowley, Jr.

## RECITALS

A.     Cherokee Acquisition Corporation, a Colorado corporation ("**Purchaser**") assigned to Indemnitor, Purchaser's interest in that certain Purchase and Sale Agreement and Joint Escrow Instructions, together with a Supplement, each dated September 9, 1998, as amended by letter amendments dated December 21, 1998, January 21, 1999, February 23, 1999, March 10, 1999, May 27, 1999, June 11, 1999 and June 23, 1999 (collectively, the "**Contract**"), between Purchaser and the Seller, pursuant to which Indemnitor has contracted to purchase from the Seller that certain real property, together with the improvements thereon, more particularly described on <u>Exhibit A</u>  to the Contract and made a part hereof (collectively the "**Property**");

B.     As a condition precedent and as partial consideration for the execution of the Contract, and the ultimate conveyance of title to the Property to Indemnitor under the Deeds, the Seller requires the execution of this Indemnity.

C.     All capitalized terms utilized herein but not otherwise defined shall have the meaning set forth in the Contract.

## AGREEMENTS

NOW, THEREFORE, in order to induce Seller to sell the Property to Indemnitor under the Contract,  and to convey the Property to Indemnitor under the Deeds, and in consideration of the matters described in the foregoing Recitals, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Recitals.** The Recitals are incorporated herein by this reference.

2.     **Indemnitor's Indemnity.**

(a)     Except as otherwise provided in Section 3 below, Indemnitor agrees to, and does hereby, fully and completely, indemnify, defend and hold harmless Seller, including, without limitation, the shareholders, directors, officers, liquidating trustee, employees, agents, successors and assigns of Seller (each, an "**Indemnified Party**"), from and

against any and all liabilities, obligations, settlements losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind of nature whatsoever, including without limitation, attorneys' fees, costs and expenses, that may be imposed on, incurred by, or asserted against any Indemnified Party, in any manner relating to or arising out of the presence of Hazardous Materials in, on, under, upon, about or beneath the Property, or arising in any manner whatsoever out of (a) the removal of any Hazardous Materials on, within or released from the Property, whether such removal is done or completed by Indemnitor or any other person or entity and regardless of whether or not such removal is rendered pursuant to a court order or the order of an administrative agency; (b) claims asserted by any person or entity (including, without limitation, any governmental agency or quasi-governmental authority, board, administrative tribunal (a "**Governmental Agency**")), in connection with or in any way arising out of the presence, storage, use, disposal, generation, or treatment of any Hazardous Material at, upon, under or within the Property, either prior to or after the date of this Indemnity and either prior to or after the time that Indemnitor became owner of the Property; (c) the violation or claimed violation of any Environmental Laws in regard to the Property, whether such violation or claimed violation occurred prior to or after the date of this Indemnity and regardless of whether such violation occurred prior to or after the time that Indemnitor became owner of the Property. An Indemnified Party may not seek indemnification or protection hereunder if the damages for which such Indemnified Party seeks indemnification arose out of any causes of action set forth in Section 3 of this Indemnity. Further, under no circumstances shall Indemnitor's obligations under this Section be:

    (1)    Greater than $5,000,000.00 in the aggregate; and

    (2)    Extend beyond ten (10) years from the Effective Date.

(b)    Any claim by an Indemnified Party arising out of and covered by this Indemnity shall be made against Indemnitor, if at all, by express written notice delivered to Indemnitor and the insurance company issuing the Environmental Insurance within the time period required by the policy of Environmental Insurance after becoming aware of a claim, and in any event, not later than April 23, 2009. Upon such notification of Indemnitor by such Indemnified Party, Indemnitor shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all attorneys' fees, costs and expenses in connection with such defense. The Indemnified Party shall have the right, at Indemnitor's expense, to employee counsel in such suit, action or claim only in the event that Indemnitor fails to assume the defense thereof and employ counsel within a reasonable period of time after being given timely notice as required herein whether or not the cost thereof is covered by the Environmental Insurance. The parties agree that the Indemnified Party's failure to notify Indemnitor within the times required by the policy of Environmental Insurance, and such failure causes Indemnitor to be in default of the terms of the Environmental Insurance or

otherwise would cause Indemnitor to incur materially greater obligations or costs in performing its duties hereunder than would have been incurred had the Indemnified Party properly notified Indemnitor and the insurance company within the times set forth in this paragraph, such breach by the Indemnified Party shall conclusively terminate any obligation Indemnitor may have under this Section 2 of this Indemnity.

(c)   Subject to the obligations of Indemnitor in paragraph 2(a) above, and so long as an Indemnified Party is not made liable or otherwise responsible therefor, Indemnitor shall have the sole right to negotiate with, and to fulfill the requirements of, any governmental agency or third party related to the foregoing obligations to indemnify, defend and hold harmless, including, without limitation, the right to retain and direct the activities of consultants, contractors and other agents and to settle or contest governmental requirements of third party claims.

3.   **Exclusions From Indemnitor's Indemnity**

Notwithstanding anything to the contrary contained in paragraph 1(a) hereof, the following matters are excluded from this Indemnity and the indemnities provided by Indemnitor herein:

(a)   transportation and offsite disposal of Hazardous Materials by any Indemnified Party;

(b)   civil penalties or fines assessed by governmental authorities against an Indemnified Party for activities prior to the Closing Date;

(c)   all claims arising from the criminal activity of any Indemnified Party; or

(d)   any lawsuits pending against an Indemnified Party as of the Closing Date related to the Property.

4.   **Delivery of Environmental Insurance**

(a)   Indemnitor shall deliver an environmental insurance policy, in the form, issued with the liability limits specified herein and approved by Seller (in its unfettered discretion) and Indemnitor as provided in the Contract ("**Environmental Insurance**").  It is understood that if Seller does not approve the insurance policy within the period provided in the Contract, there will not be a closing of the Contract.  If a claim is made or any action is brought against an Indemnified Party with respect to a matter covered by Indemnitor's indemnity hereunder and the Environmental Insurance, and upon receipt by Indemnitor of the notice from the Indemnified Party required herein, then Indemnitor shall tender the claim or action to the insurer under the Environmental Insurance, shall

pursue such claim with reasonable diligence and shall apply all insurance proceeds received for such claim to the discharge of the Indemnitor's indemnity obligations hereunder. In any event, the Environmental Insurance shall provide that no cancellation thereof shall be effective until at least ten days after receipt by Indemnitor and Indemnified Party of written notice thereof, and shall be a "claims made" policy. The premium for the Environmental Insurance shall be paid in full at time of issuance. Indemnitor hereby covenants, represents and warrants to fully comply with all conditions and obligations of the policy of Environmental Insurance so as to cause it to remain effective during the entire term of this Indemnity. Upon such default by Indemnitor, said Environmental Insurance shall cover the Seller as defined in paragraph 2(a) herein. If said Environmental Insurance is cancelled for breach of the foregoing Contract, by Indemnitor, the Indemnitor shall be liable herein for the amount and for the times and terms as provided in this Indemnity Agreement.

(b)      Indemnitor shall use its best efforts to cause the Environmental Insurance to include a provisions that if Indemnitor is in default hereunder by failing to make a claim under the Environmental Insurance, failing to give notice to the representative of the Indemnified Parties and/or the insurance company, or failing to cooperate with the representative of the Indemnified Parties, the representative of the Indemnified Parties may act on Indemnitor's behalf, including but not limited to filing claims, Indemnitor shall indemnify the Indemnified Parties if Indemnitor's acts or omissions adversely affect the Environmental Insurance. If Indemnitor is successful in obtaining such a provision, any cost thereof shall be at the sole expense of Seller, and shall be credited against the Purchase Price set forth in the Contract.

5.      **Survival and Transferability of Indemnity**

(a)      The obligations of Indemnitor and Indemnified Party under this Indemnity shall survive the transfer of title to the Property to Indemnitor. No Indemnified Party shall have the right to enforce the foregoing obligations to indemnify, defend and hold harmless, or to recover any amounts payable by Indemnitor pursuant to such provisions, against any asset or right of Indemnitor other than the policy of Environmental Insurance, the proceeds thereof and Indemnitor's right, title and interest in the Property except as otherwise provided in this paragraph. Indemnitor shall grant to the Indemnified Party a security interest in each Project constituting the Property which shall secure the obligations set forth in this Indemnity. The security interest shall be evidenced by a mortgage or deed of trust recorded against each Project, each of which instruments shall have a term which expires on the earlier of: (i) the tenth anniversary from the Effective Date, or (ii) receipt from the appropriate governmental authority that the applicable Project which required remediation has been so remediated, and that no further remediation actions shall be required (except for additional monitoring), or (iii) the date on which any of Projects 3, 4 or 5 identified on Schedule 1 attached hereto, none of which require remediation, is sold to a third party, or (iv) the date on which either of

4.

Projects 1 or 2 identified on Schedule 1 attached hereto, which require remediation, but which has not been so remediated is sold to a third party and an escrow account is established with an amount of money equal to the remediation costs attributable to such Project, in which event Indemnitor shall grant the Indemnified Party a security interest in such account upon defeasance of the applicable mortgage or deed of trust. Each such security instrument shall provide that it is subordinate to any existing or new financing placed on the Project, and shall provide for an automatic release of the Project if an event described in clauses (i) - (iv) above occurs. No Indemnified Party shall have the right to proceed against or levy upon any other property or any asset, whether now owned or acquired in the future, of any person or entity affiliated with Indemnitor including, without limitation, Indemnitor's or those other entities' officers, directors or agents.

(b)     In the event of a sale or conveyance by Indemnitor within the period of this Indemnity of any Project constituting the Property which has not met any of the standards set forth in any of clauses (i) - (iv) in paragraph (a) above, the security interest encumbering such Project shall continue. Thereafter, (i) Indemnitor shall continue to have an obligation to indemnify, defend and hold harmless the Indemnified Parties hereunder with respect to such Project sold or conveyed, and shall remain as an additional insured on the policy of Environmental Insurance, and (ii) the successor owner must assume, in writing, Indemnitor's indemnity obligations hereunder with respect to the Project purchased. The successor owner shall be made a named insured to the Environmental Insurance, or shall be shown as a named insured on a separate policy of environmental insurance which is substantially the same as the Environment Insurance, provided that Indemnified Party reasonably approves the successor owner's financial condition and other conditions reasonably related to such successor's ability to perform its assumed indemnity obligations. If Indemnified Party does not notify Indemnitor within fourteen (14) days after submission by Indemnitor of the successor owner's financial information of its disapproval of the successor owner's financial condition, the Indemnified Party shall be deemed to have approved of the same.

(c)     In the event of a sale or conveyance by Indemnitor (or its successor owner pursuant to paragraph 5(b) above) within the period of this Indemnity of any Project constituting the Property which has met any of the standards set forth in any of clauses (i) - (iv) in paragraph (a) above, the security interest encumbering such Project shall be terminated without further action being required of any party hereto, provided that  the same shall be released of record (1) upon recordation by the Indemnified Party of a release of such instrument, or (2) automatically upon expiration of 15 days following recordation by Indemnitor of an affidavit referring to such Project and to this Indemnity evidencing receipt of notice thereof by the Indemnified Party, certifying that the Indemnified Party's rights hereunder have been terminated in accordance with the terms and provisions set forth herein, so long as the Indemnified Party has not commenced an action within said 15 day period affecting the applicable Project and alleging that the affidavit is incorrect. Thereafter, (i) Indemnitor shall continue to have an obligation to

5

indemnify, defend and hold harmless the Indemnified Parties hereunder with respect to such Project sold or conveyed, and shall remain as an additional insured on the policy of Environmental Insurance, (ii) the successor owner shall not be required to assume Indemnitor's indemnity obligations hereunder with respect to the Project purchased, but the successor owner shall be made a named insured to the Environmental Insurance, or shall be shown as a named insured on a separate policy of environmental insurance which is substantially the same as the Environment Insurance, and (iii) this Indemnity shall only be secured by the Environmental Insurance and the remaining Projects constituting the Property.

6.      **No Waiver.**  Indemnitor's obligations hereunder shall in no way be impaired, reduced or released by reason of the Indemnified Party's omission or delay to exercise any right described herein or in connection with any notice (except for notices required of the Indemnified Party pursuant to this Indemnity), demand, warning or claim regarding violations of any Hazardous Materials Laws governing the Property.

7.      For all purposes hereof, one person shall be designated to act on behalf of all of the Indemnified Parties, and shall give written notice to Indemnitor of any change of such designated party.  Jerome J. Crowley, Jr. is hereby appointed to act in all respects on behalf of each Indemnified Party as their attorney in fact, which right is hereby coupled with an interest. Indemnitor shall be entitled to rely on any representation, agreement or act of Jerome J. Crowley, Jr. in connection herewith without requiring the consent or approval of any other Indemnified Party. The Parties shall establish a procedure to appoint a successor to Jerome J. Crowley not later than the closing of the Contract.

8.      **Notices.**  Any notice, demand or request required hereunder shall be given in writing at the addresses set forth below by personal delivery, or registered or certified, first class mail, return receipt requested.  Notice shall be deemed delivered (i) upon personal delivery, or (ii) one (1) business day after deposit with a nationally-recognized overnight courier service, or (iii) three (3) days after deposit with the U.S. postal service, registered or certified mail, postage prepaid, or (iv) on the business day of a facsimile which is confirmed (provided, however, confirmation is after 4:30 p.m. local time of the recipient or on a non-business day, receipt shall be deemed to have occurred on the next following business day).  The addresses may be changed by notice to the other party given in the same manner as provided above.

        If to an Indemnified Party:

                The O'Brien Corporation
                2483 Old Middlefield Way, Suite 103
                Mountain View, California  94040
                Attn:  Jerome J. Crowley, Jr.
                FAX: 650-254-8972

With a copy to:

> Crowley Barrett & Karaba, Ltd.
> 20 So. Clark Street, Suite 2310
> Chicago, Illinois  60603-1895
> Attention:  Alan Rauh Orschel, Esq.
> FAX:  (312) 726-2741

If to Indemnitor:

> c/o Cherokee Environmental Realty Advisors
> 5445 D.T.C. Parkway
> Suite 900
> Englewood, Colorado  80111
> Attention:  Dwight Stenseth, Vice President
>                     and Chief Operating Officer
> FAX:  (303) 771-9270

With a copy to:

> Brownstein Hyatt & Farber, P.C.
> 410 17th Street, 22nd Floor
> Denver, Colorado  80202
> Attention:  Jay F. Kamlet, Esq.
> FAX:  (303) 623-1956

9.      **Entire Agreement.** This Indemnity, in addition to the Contract, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter contained in this Indemnity.

10.      **Amendment and Waiver.** This Indemnity may not be amended except by a writing signed by both parties nor shall observance of any term of this Indemnity be waived except with the written consent of the Indemnified Party.

11.      **GOVERNING LAW.** THIS INDEMNITY SHALL BE GOVERNED AND CONTROLLED AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT AND IN ALL OTHER RESPECTS BY THE LAWS STATUTES AND DECISIONS OF THE STATE IN WHICH THE APPLICABLE PROPERTY IS LOCATED. EACH INDEMNITOR, IN ORDER TO INDUCE THE INDEMNIFIED PARTY TO ACCEPT THIS INDEMNITY, AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING DIRECTLY, INDIRECTLY OR OTHERWISE IN CONNECTION WITH THIS INDEMNITY SHALL BE LITIGATED, AT THE INDEMNIFIED PARTY'S SOLE

7

ELECTION ONLY, IN ANY COURT OF COMPETENT JURISDICTION IN THE STATE IN WHICH THE APPLICABLE PROPERTY IS LOCATED. INDEMNITOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED IN THE STATE IN WHICH THE APPLICABLE PROPERTY IS LOCATED. EACH INDEMNITOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST IT BY THE INDEMNIFIED PARTY ON THIS INDEMNITY IN ACCORDANCE WITH THIS SECTION.

IN WITNESS WHEREOF, this Indemnity has been executed as of the date first above written.

INDEMNITOR:

Cherokee San Francisco, LLC, a Delaware limited liability company

By:_____

Name: Dwight Stenseth

Title:   Vice President

SELLER:

The O'Brien Corporation, an Indiana corporation

By_____

Name: Jerome J. Crowley, Jr.

Title: President

8

## SCHEDULE 1

1.   South San Francisco, California

2.   Brunswick, Georgia

3.   Houston, Texas - 11000 Block SH 288

4.   Anchorage, Alaska - 707 Gambell Street

5    Anchorage, Alaska - 12 Laurel Acres Lots

# EXHIBIT 3

## REMEDIATION COST SHARING AGREEMENT

This Remediation Cost Sharing Agreement ("Agreement") is entered into this _____ day of March, 2008, by and among ARTHUR LEE HASKINS and RICHARD ELMO HASKINS (collectively, "Haskins"); CHEROKEE SAN FRANCISCO, L.L.C. and CHEROKEE GRAND AVENUE, L.L.C. (collectively, "Cherokee"); and SOUTH SAN FRANCISCO SCAVENGER CO. ("Scavenger").  Haskins, Cherokee, and Scavenger are referred to collectively in this agreement as the "Parties."  The date first listed on this Agreement shall be referred to as the "Effective Date."

**A.** **Recitals.**

1.      Haskins is the current owner of the Former San Bruno Channel property located at 500 East Jamie Court, South San Francisco, California (the "Property").

2.      Scavenger is the current owner of 500 East Jamie Court, which immediately borders the Property to the South.  Scavenger is a signatory to the Bay Conservation Development Commission ("BCDC") permit to develop 500 East Jamie Court, including a requirement to bridge the Property with a section of the Bay Trail.

3.      The Property is bounded by the San Francisco Bay to the East, the former Haskins landfill (currently the South San Francisco Scavengers transfer station) to the South, the Yellow Freight Company to the West, and the former Fuller-O'Brien paint manufacturing facility to the North.

4.      Cherokee is a former owner of the Fuller-O'Brien paint manufacturing facility.

5.      Some or all of the Property falls under the jurisdiction of the San Francisco Bay Regional Water Quality Control Board ("Water Board"), the Bay Conservation and Development Commission ("BCDC"), and the U.S. Army Corps of Engineers (USACE) (collectively, the "Regulatory Authorities").

6.      Environmental investigations of the Property indicate that portions of the Property's soils and sediments are impacted by heavy metals and semivolatile organic compounds (the "Identified Contamination").

7.      The Water Board and the BCDC previously required Haskins and Cherokee to prepare a corrective measures workplan to address the Identified Contamination.  Accordingly, Haskins and Cherokee jointly submitted a Corrective Measure Workplan to the Water Board and BCDC on October 3, 2000 (the "Original Workplan").  Both the Water Board and the BCDC required Haskins and Cherokee to revise the Original Workplan to provide additional detail.

8.      On September 27, 2005, Haskins and Cherokee entered into an Environmental Cost Sharing Agreement under which Haskins and Cherokee agreed to equally share the costs of preparation and approval of a Revised Corrective Measures Workplan.

9.      In accordance with Environmental Cost Sharing Agreement, a Revised Corrective Measures Workplan was prepared by the environmental consulting firm EnviroAssets, Inc, located at 2450 Washington Avenue, Suite 270, San Leandro, California 94577 ("EnviroAssets").  This Revised Corrective Measures Workplan (the "Revised Workplan") is dated November 7, 2006 and is attached as Exhibit A.  The Revised Workplan has been conditionally approved by the Water Board and has been approved by the BCDC and USACE.

10.     A dispute exists between the Parties as to their respective obligations, if any, to perform and pay the costs associated with remediation of the Identified Contamination and implementation of the Revised Workplan (the "Dispute").  Accordingly, no agreement or allocation as to responsibility for the Identified Contamination has been imposed upon or agreed to by the Parties.

11.     The Parties desire to implement the corrective measures identified in the Revised Workplan as well as certain contour grading revisions requested by the BCDC.

12.     The Parties also desire to obtain final approval from the appropriate Regulatory Authorities, including USACE and the Water Board.  In order to obtain final approval from the USACE, approximately 3-5 years of long term maintenance, monitoring, and reporting will be required following completion of the corrective measures identified in the Revised Workplan.  These maintenance, monitoring, and reporting requirements are identified in Appendix D to the Revised Workplan.

13.     In order to obtain final approval from the Water Board, the Property owner (Haskins) must also obtain a deed restriction for the property.

14.     The corrective measures identified in the Revised Workplan; the contour grading revisions requested by BCDC; the long-term maintenance, monitoring and reporting requirements; and the procurement of the deed restriction are referred to collectively as the "Remediation Work."

15.     "Substantial Completion" of the Remediation Work is defined as completion of all elements of the Revised Workplan with exception of the maintenance, monitoring and reporting requirements identified in Appendix D to the Revised Workplan.

16.     EnviroAssets has prepared a Cost Estimate for the performance of the Remediation Work.  This Cost Estimate is dated June 28, 2007 and is attached as Exhibit B.  In accordance with the Cost Estimate, the estimated cost to complete the Remediation Work in is $1,208,507 (One Million, Two Hundred Eight Thousand, Five Hundred Seven Dollars).

17.     The Parties wish to conduct the Remediation Work without delay, but wish to fully protect their respective rights under the law or any other agreement among the Parties.

18.     The Parties wish to equally share the costs of performing the Remediation Work.

2

19.     The Parties have common goals of performing the Remediation Work in a timely, cost-effective manner and satisfying environmental regulatory concerns regarding the Property.

**THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**B.     Agreement.**

1.     No Waiver.  Except as specifically set forth herein, no Party has waived any right or remedy in connection with the Dispute, the Property, or any other agreement entered into with respect to the Property, including but not limited to any rights and remedies with respect to the Revised Workplan and the Remediation Work.

2.     Reservation of Rights.  Except as specifically set forth herein, each Party acknowledges and agrees that the other Party has reserved all of its rights, remedies, and defenses in connection with the Dispute, the Property, or any other agreement entered into with respect to the Property, including but not limited to any rights and remedies with respect to the Revised Workplan and the Remediation Work.  Nothing contained in this Agreement shall be construed as an admission of any fact or liability of any Party to this Agreement.

3.     Procedures.  The Parties agree that EnviroAssets shall implement the corrective measures identified in the Revised Workplan as well as the remainder of the Remediation Work, as identified in the Cost Estimate.  EnviroAssets shall also seek all required approvals from the Regulatory Authorities.  The Parties shall have an equal opportunity to review and comment on the progress and scope of the Remediation Work.  To the extent required, the Parties will cooperate equally to secure all required approval of the Remediation Work from the Regulatory Authorities.

4.     Scope of Agreement and Cost Sharing.

   a.     This Agreement shall apply to all costs incurred for goods and services provided by EnviroAssets and EnviroAssets' agents for the performance of the Remediation Work, up to and including $1,208,507 (One Million, Two Hundred Eight Thousand, Five Hundred Seven Dollars).

   b.     Each Party agrees to pay 1/3 of the above costs for performance of the Remediation Work, up to and including $402,835 (Four Hundred Two Thousand Eight Hundred Thirty Five Dollars) for each party (the "Funds").

   c.     Each Party agrees to place its share of the Funds in an escrow account to be governed by a separate Escrow Agreement.  A copy of this Escrow Agreement is attached as Exhibit C.

   d.     Each Party agrees to fund the escrow account under the Escrow Agreement as follows:

3

      i.      Each Party will make a good-faith contribution of $40,000 (Forty Thousand Dollars) to the escrow account within 30 (thirty) calendar days of the Effective Date of this Agreement.

      ii.      The Parties anticipate that they will enter into a separate contract with EnviroAssets which sets forth the start date for the Remediation Work (the "Contracted Start Date") and a proposed timeline for the Remediation Work.  The Parties agree to contribute 100% of their remaining portion of the Funds, in the amount of $362,835 (Three Hundred Sixty Two Thousand Eight Hundred Thirty Five Dollars) for each party, no later than 45 (forty five) calendar days before the Contracted Start Date.

      iii.      Any Party's failure to contribute its full portion of the Funds no later than 30 (thirty) calendar days before the Contracted Start Date shall constitute a breach of this Agreement and shall result in the Agreement's automatic termination.

5.      <u>Effective Date and Termination.</u>  This Agreement shall be effective on the Effective Date first written above.  If the Agreement is not automatically terminated under Paragraph 4.d.iii, this Agreement shall remain in effect until the Remediation Work has been approved by all appropriate authorities; until the funds in the escrow account are exhausted; or, with respect to Cherokee and Scavengers, until the following Advanced Termination conditions are selected.  In the alternative, this Agreement may be terminated by the mutual consent of all Parties.

      a.      Following Substantial Completion of the Revised Workplan, Haskins shall provide a full release of liability in the form attached as Exhibit D for a party requesting Advanced Termination (the "Requesting Party") if the following conditions are met:

      i.      Haskins and the Requesting Party(s) shall jointly seek a cost estimate from EnviroAssets for all remaining Remediation Work, including but not limited to USACE's requirements for long-term maintenance, monitoring and reporting.

      ii.      Each Requesting Party shall deposit into the escrow account an amount no less than 1/3 of the total cost estimate to complete the remaining Remediation Work, plus a contingency fee of 20%.  If the cost estimate for all remaining Remediation Work is less than the total Funds remaining in escrow following Substantial Completion plus 20%, each Requesting Party agrees to release all claim to its share of the remaining Funds. ...

      b.      In consideration for the release of liability from Haskins in the form attached as Exhibit D, each Requesting Party shall release any and all claims on escrow account Funds that remain following final completion of

4

the Remediation Work and receipt of final regulatory approval.  Haskins shall be entitled to the Requesting Party's full share of any remaining Funds.

6.      Modifications.  This Agreement contains the entire understanding of the Parties regarding the issues addressed herein.  Any change, amendment, or alteration to this Agreement must be in writing and signed by each Party to be effective.

7.      Severability.  If any portion of this Agreement shall to any extent be held to be invalid, the remainder of this Agreement shall not be affected, and each provision under this Agreement shall be valid and enforceable to the fullest extent permitted by law.

8.      Assignment.  This Agreement cannot be assigned by Haskins, Cherokee, or Scavenger without the prior written consent of the other Parties.

Executed as of the first date set forth above.

ARTHUR LEE HASKINS
RICHARD ELMO HASKINS

By:      _____

Name:  _____

Title:   _____

CHEROKEE SAN FRANCISCO, L.L.C.
CHEROKEE GRAND AVENUE, L.L.C.

By:      _____

Name:  _____

Title:   _____

SOUTH SAN FRANCISCO SCAVENGER CO.

By:      _____

5

Name: _____

Title: _____


### **EXHIBITS**

Exhibit A:    Revised Corrective Measures Workplan, Former San Bruno Channel Property, prepared by EnviroAssets, Inc., dated November 7, 2006

Exhibit B:    Former San Bruno Channel Cost Estimate, prepared by EnviroAssets, Inc., dated June 28, 2007

Exhibit C:    [Escrow Agreement – to be drafted]

Exhibit D:    [Release – to be drafted]