1 Stephen McKae, Bar No. 66797
Steven M. Morger, Bar No. 115108
2 **WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
3 Oakland, California 94607
Telephone: (510) 834-6600
4 Fax: (510) 834-1928
Email: smckae@wendel.com

Attorneys for Defendants/Counterclaimants
Cherokee San Francisco, LLC, Cherokee Grand
Avenue, LLC, and Defendants Cherokee Investment
Partners II, L.P., and Cherokee Acquisition Corp.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RICHARD E. HASKINS, an individual; ARTHUR L. HASKINS, an individual; and ESTATE OF ARTHUR "BUZZ" HASKINS, JR., DECEASED, a deceased individual,<br><br>Plaintiffs,<br><br>vs.<br><br>CHEROKEE GRAND AVENUE LLC., a Delaware limited liability company; CHEROKEE SAN FRANCISCO, LLC, a Delaware limited liability company; CHEROKEE INVESTMENT PARTNERS II, L.P., a Delaware limited partnership; CHEROKEE ACQUISITION CORP., a Colorado corporation; FULLER-O'BRIEN, a surrendered Delaware corporation; and DOES 1 through 100,<br><br>Defendants. | Case No. CV 11 5142 YGR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE CHEROKEE'S ANSWER AND COUNTERCLAIM** |
| CHEROKEE SAN FRANCISCO, LLC and CHEROKEE GRAND AVENUE, LLC,<br><br>Counterclaimants,<br><br>vs.<br><br>RICHARD E. HASKINS, ARTHUR L. HASKINS, and ESTATE OF ARTHUR "BUZZ" HASKINS, JR., DECEASED,<br><br>Counterdefendants. | |

# TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|------|
| I. | ARGUMENT | | 1 |
| | A. | The answer to paragraph 21 of the Complaint is proper and no ground exists for striking it | 1 |
| | | 1. Plaintiffs invited a broad denial by their use in Paragraph 21 and elsewhere of a collective term, "Cherokee," for four separate Defendants whose relationships to the transactions in dispute differ substantially | 1 |
| | | 2. Plaintiffs invited a broad denial by their failure in Paragraph 21 to specify the terms of the asserted indemnity and the individual Defendants to which it relates | 3 |
| | | 3. The introduction of materials not on the face of the answer and not subject to judicial notice is improper in support of a motion to strike, and those materials cannot be relied upon in deciding the motion | 4 |
| | B. | Plaintiffs' objections to the thirty-seventh affirmative defense (bona fide prospective purchaser) do not Support a motion to strike | 5 |
| | | 1. Plaintiffs cannot prevail on the motion unless they can convince the court that that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed | 6 |
| | | 2. The restriction on immunity of liability as a bona fide prospective purchaser based on nothing more than the date of purchase is an arbitrary distinction that exposes that requirement to challenge under the Fifth Amendment as a violation of due process and makes this issue inappropriate for a motion to strike | 8 |
| | C. | Plaintiffs' objections to the twenty-sixth affirmative defense (statute of frauds) do not support a motion to strike | 12 |
| | | 1. Defendants have identified no basis on the face of the pleadings for granting the motion | 14 |
| | | 2. The introduction of materials not on the face of the answer and not subject to judicial notice is improper in support of a motion to strike, and those materials cannot be relied up in deciding the motion | 14 |
| II. | CONCLUSION | | 15 |

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, CA 94607

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bolling v. Sharp*,
 347 U.S. 497 (1954) .................................................................................................. 8, 9

*Bowen v. Gilliard*,
 483 U. S. 587 (1987) ....................................................................................................... 9

*Carmichael v. Southern Coal & Coke Co.*,
 301 U. S. 495 (1937) ....................................................................................................... 9

*Connolly v. PBGC*,
 475 U.S. 211 (1986) ...................................................................................................... 12

*Dandridge v. Williams*,
 397 U. S. 471 (1970) ....................................................................................................... 9

*FCC v. Beach Communications, Inc.*,
 508 U.S. 307 (1993) ........................................................................................................ 9

*Flemming v. Nestor*,
 363 U. S. 603 (1960). ...................................................................................................... 9

*Hampton v. Mow Sun Wong*,
 426 U.S. 88 (1976) .......................................................................................................... 9

*Hodel v. Indiana*,
 452 U. S. 314 (1981) ....................................................................................................... 9

*Lazar v. Trans Union LLC*,
 195 F.R.D. 665 (C.D. Cal. 2000) .................................................................................... 1

*Lehnhausen v. Lake Shore Auto Parts Co.*,
 410 U. S. 356 (1973) ....................................................................................................... 9

*Lyng v. Castillo*,
 477 U.S. 635, n. 2 (1986) ................................................................................................ 9

*Minnesota v. Clover Leaf Creamery Co.*,
 449 U. S. 456 (1981) ....................................................................................................... 9

*Multimedia Patent Trust v. Microsoft Corporation*,
 525 F.Supp.2d 1200 (S.D. Cal. 2007) ............................................................................. 1

*Nordlinger v. Hahn*,
 505 U. S. 1 (1992) ........................................................................................................... 9

*Security & Exchange Comm. v. Sands* ("*Sands*"),
 902 F.Supp. 1149 (C.D. Cal. 1995) .................................................................. 1, 4, 12, 14

*Sullivan v. Stroop*,
 496 U. S. 478 (1990) ....................................................................................................... 9

*Systems Corp. v. American Telephone Telegraph*,
 60 F.R.D. 692 (S.D.N.Y. 1973) ..................................................................................... 12

*United States Dept. of Agriculture v. Moreno*,
  413 U.S. 528, n. 5 (1973 ............................................................................................................ 9

*United States Railroad Retirement Bd. v. Fritz*,
  449 U. S. 166 (1980) ............................................................................................................ 9, 10

*Usery v. Turner Elkhorn Mining Co.*,
  428 U. S. 1, 428 U. S. 15 (1976) .............................................................................................. 12

*Vance v. Bradley*,
  440 U. S. 93 (1979) ..................................................................................................................... 9

**STATUTES**

42 U.S.C.
  § 9601(40) ............................................................................................................................. 5, 6
  § 9607(r) ................................................................................................................................ 5, 6
Fed.R.Civ.P.
  12(f) ............................................................................................................................................ 1

**OTHER AUTHORITIES**

Wright & Miller, Federal Practice & Procedure: Civil
  2d § 1380, at 647-49 (1990) ..................................................................................................... 15

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, CA 94607

Defendants Cherokee San Francisco, LLC ("Cherokee San Francisco"), Cherokee Grand Avenue, LLC ("Cherokee Grand Avenue"), Cherokee Acquisition Corp. ("Cherokee Acquisition"), and Cherokee Investment Partners II, L.P. ("CIP II") submit this memorandum in opposition to Plaintiffs' Motion to Strike Cherokee's Answer and Counterclaim. Though styled sweepingly, the motion seeks to strike one paragraph, Paragraph 21, of the Answer and two affirmative defenses, the Thirty-Seventh Affirmative Defense (Bona Fide Prospective Purchaser) and Twenty-Sixth Affirmative Defense (Statute of Frauds). Defendants oppose the motion on each of these points.

## I. ARGUMENT

The motion to strike is governed by Fed.R.Civ.P. 12(f), under which "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter. Plaintiffs correctly state that the grounds for a motion to strike must appear on the face of the challenged pleading or from matters which the court may judicially notice, *Security & Exchange Comm. v. Sands* ("*Sands*"), 902 F.Supp. 1149, 1165 (C.D. Cal. 1995), and that when ruling on a motion to strike, a court must view the challenged pleading in the light most favorable to the pleader. *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 669 (C.D. Cal. 2000); *Multimedia Patent Trust v. Microsoft Corporation*, 525 F.Supp.2d 1200, 1211[1] (S.D. Cal. 2007).

### A. The answer to paragraph 21 of the Complaint is proper and no ground exists for striking it.

#### 1. Plaintiffs invited a broad denial by their use in Paragraph 21 and elsewhere of a collective term, "Cherokee," for four separate Defendants whose relationships to the transactions in dispute differ substantially.

Paragraph 21 of Plaintiffs' First Amended Complaint ("Complaint") alleges:

> In approximately 1999, Cherokee purchased the Fuller-O'Brien Property and took over the investigation and cleanup of the hazardous waste contamination and indemnified Fuller-O'Brien.

The answer states:

---

[1] Plaintiffs' memorandum gives the page citation as 525 F. Supp.2d 1200, 1207. We believe that Plaintiffs intended to refer to page 1211 for this point.

21. Except as expressly averred in the response to paragraphs 6 through 8, inclusive, Defendants deny each and every allegation of paragraph 21.

Understanding the answer requires reference to other allegations of the Complaint and defendants' response. In the introductory paragraph of the Complaint, Plaintiffs chose to use a single term, "Cherokee", to refer to four separate entities: Cherokee San Francisco, LLC, Cherokee Grand Avenue, LLC, Cherokee Acquisition Corp., and Cherokee Investment Partners II, L.P. The term, "Cherokee" is used in Paragraph 21 as though all four entities purchased the "Fuller-O'Brien Property" without regard to their separate identity. Taken on its face, Paragraph 21 of the Complaint asserts that all four entities purchased the property and all four entered into agreements with Fuller-O'Brien concerning hazardous waste cleanup and indemnity. Defendants dispute that.

The "Fuller-O'Brien Property" is defined in Paragraph 8 of the Complaint as including three parcels, "collectively, APN 015-102-270, APN 015-101-090, and APN 015-102-280". The answer, unlike the Complaint, distinguishes among the purchasers of the three parcels as described below.

In Paragraphs 6 through 9 of the Complaint, Plaintiffs made certain allegations concerning the identity of the four separate entities and the parcels purchased. Paragraph 10 alleges that "[e]ach of the Cherokee entities was acting as an agent for the other with respect to the performance of the actions alleged herein." Defendants dispute that such agency existed in the answer to Paragraph 10, and the ramifications of that denial carry through the answer to Paragraph 21 and others.

Paragraph 6 of the Complaint alleged, contrary to Paragraph 21, that "Cherokee Acquisition Corporation, is a Colorado corporation . . . purchased the real property (APN 015-102-270) to the north of and adjacent to the Site by grant deed dated June 25, 1999." Defendants admitted in the answer to Paragraph 6 that parcel APN 015-102-270 was conveyed to Cherokee Acquisition Corp. (incorrectly identified in the Complaint as Cherokee Acquisition Corporation) on June 25, 1999 but denied other allegations of Paragraph 6 not pertinent to the current motion.

Paragraph 7 of the Complaint alleged that "Cherokee Grand Avenue is a Delaware limited

1 liability company that was conveyed the real property (APN 015-102-270) to the north of and
2 adjacent to the Site under a grant deed dated November 10, 1999." Continuing to distinguish
3 among the four entities, the answer to Paragraph 7 disputes aspects of that allegation but concedes
4 that APN 015-102-270 was "conveyed to Cherokee Grand Avenue by Cherokee Acquisition
5 Corp. by deed dated November 10, 1999."

Paragraph 8 of the Complaint alleges among other things, and defendants do not dispute, that parcels APN 015-101-090 and APN 015-102-280 were conveyed to Cherokee San Francisco by deed dated June 9, 1999.

There is no allegation in the Complaint that CIP II acquired any of the three parcels. There is only the allegation in Paragraph 10, disputed by defendants in the answer, that each of the Cherokee entities was acting as an agent for the other.

Paragraph 21 of the answer therefore correctly denies the allegation that "Cherokee" purchased the Fuller-O'Brien Property. Further, the Complaint nowhere alleges the existence of any agreements between Fuller-O'Brien and any of the four separate Defendants, only the assertion in Paragraph 21, to which the motion to strike is directed, that all four, defined by Plaintiffs as "Cherokee," "indemnified Fuller-O'Brien." No foundation for that allegation is established in the Complaint, it is untrue, and Defendants dispute it.

**2. Plaintiffs invited a broad denial by their failure in Paragraph 21 to specify the terms of the asserted indemnity and the individual Defendants to which it relates.**

Again, the allegation of Paragraph 21 of the Complaint is that:

In approximately 1999, Cherokee purchased the Fuller-O'Brien Property and took over the investigation and cleanup of the hazardous waste contamination and indemnified Fuller-O'Brien.

This allegation is so vague as to the meaning of "indemnified" that it invites a specific denial. Plaintiffs' pursuit of this point is puzzling because the Joint Initial Case Management Conference Statement and [Proposed] Order ("Joint CMC Statement") (Dkt. No. 17, page 3, lines 3-25) describes the separate transactions with two different sellers that is clear enough that Plaintiffs can hardly claim confusion or prejudice tied to Defendants' answer to Paragraph 21. The Joint CMC Statement says:

**Fuller-O'Brien Paints**, a unit of O'Brien Corporation as of 1999, owned and operated a paint manufacturing facility adjacent to the San Bruno Channel Site on the north from approximately the late 1800s to the late 1900s. On July 2, 1999, a deed was recorded conveying two parcels from Fuller-O'Brien to Cherokee San Francisco. On July 1, 1999, a deed was recorded conveying a third adjacent parcel from **Glidden Company** d/b/a ICI Paints to Cherokee Acquisition. That parcel was then conveyed from Cherokee Acquisition to Cherokee Grand Avenue by deed recorded December 2, 1999. All three parcels, nominally located at 450 E. Grand Avenue, South San Francisco, were then conveyed to Slough Near North LLC in December 2000 under a sale agreement with Slough Estates USA Inc. Slough Estates USA Inc. then developed the property for the new Genentech facility. The three parcels are referred to collectively herein as the "Fuller-O'Brien Property."

In connection with the acquisition of the **two parcels** from Fuller-O'Brien, **Cherokee San Francisco** entered into an Environmental Indemnity Agreement with the parent company, O'Brien Corporation, by which it agreed to indemnify and hold O'Brien Corporation harmless from **certain expenses and liabilities related to the presence or removal of certain defined Hazardous Materials on the O'Brien Corporation property, from claims asserted by certain agencies and other third parties related to the presence of Hazardous Materials on the O'Brien Corporation property, and from certain violations of a defined set of "Environmental Laws."** The obligation under the Environmental Indemnity Agreement **included a dollar cap** on costs and terminated ten years after the Effective Date. The agreement was executed on June 23, 1999 **and the indemnity obligation terminated in June 2009. Cherokee Grand Avenue** entered into a similar agreement with **The Glidden Company** for the property sold by Glidden that also contained a ten-year term limit. That indemnity obligation also has terminated. [Emphasis added.]

That statement was filed January 27, well before the current motion or any of Plaintiffs' correspondence challenging the response to Paragraph 21. It is evident that Plaintiffs understood who the parties to the indemnity agreements were, that they were not identical parties, that there were qualifications and restrictions to any indemnity obligation, that the indemnities were capped as to dollar amount and time.

### 3. The introduction of materials not on the face of the answer and not subject to judicial notice is improper in support of a motion to strike, and those materials cannot be relied upon in deciding the motion.

*Security & Exchange Comm. v. Sands, supra*, 902 F.Supp. at 1165 says, "The grounds for the motion must appear on the face of the pleading under attack from matter which the court may judicially notice." Plaintiffs seek to support their motion by declaration and an exhibit, an "Environmental Indemnity Agreement." This is improper under the rules and the declaration and exhibit cannot be relied upon as the basis for the motion. Further, the declarant, counsel for Plaintiffs, fails to establish a foundation for the document from personal knowledge and the

document and supporting declaration are inadmissible under FRE 601, 801, 802, 901 and 902.

**B. Plaintiffs' objections to the thirty-seventh affirmative defense (bona fide prospective purchaser) do not Support a motion to strike.**

Plaintiffs seek to strike Defendants' Thirty-Seventh Affirmative Defense, which says:

> To the extent that answering Defendants are named as parties to this action on account of their ownership or operation of a facility, they have no liability because prior to acquiring the property they conducted all appropriate inquiry, and subsequent to acquiring the property they filed all legally required notices; exercised appropriate care to stop any continuing release, prevent any threatened future release, and prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance; provided full cooperation and assistance in accessing the site; complied with and did not impede the implementation of institutional controls; were not otherwise a potentially responsible party, and had no affiliation with parties potentially liable for response costs in connection with the facility. Defendants are entitled to a complete defense under CERCLA §101(40) and 107(r), respectively 42 U.S.C. 9601(40) and 9607(r), as bona fide prospective purchasers.

Plaintiffs do not question the accuracy or appropriateness of the allegations made in the first sentence. In fact, the property had been undergoing remediation under the supervision of public agencies, including the U.S. Environmental Protection Agency, for more than a decade prior to purchase, some of it nearly completed. The Joint CMC Statement (Dkt. No. 17, page 3, line 26 through page 5, line 1) notes:

> Environmental investigation of soil and three water bearing groundwater units was begun at the Fuller-O'Brien Property prior to the acquisition of that property in 1999. In December 1987, a Resource Conservation Recovery Act (RCRA) Facility Assessment (RFA) was completed by U.S. Environmental Protection Agency ("USEPA") contractors. The main hazardous waste and hazardous waste constituent of concern was lead; other constituents were metals, volatile organic compounds, and semi-volatile compounds.
>
> USEPA separated the site investigation into two parts: soil and groundwater. USEPA in April 2000 approved a remedy for the soils units including soil removal, capping, and land use restrictions. Soils were excavated and disposed of offsite, and two low permeability caps, 4,740 and 45,765 square feet in area, were constructed on portions of the property to eliminate exposure to contaminated soil. The soil corrective actions were completed in 2000 and the EPA issued a "No Further Action" letter for soil at the Fuller-O'Brien Property on September 18, 2000.
>
> DTSC took the lead in overseeing a groundwater investigation in 2000. Cherokee San Francisco and Cherokee Grand Avenue entered into a Corrective Action Consent Agreement ("CACA") P2-00/01-008 under the Department of Toxic Substances Control ("DTSC") Voluntary Cleanup Program. With that agreement, DTSC began to oversee a RCRA Facility Groundwater Investigation including sampling of existing monitoring wells, installation of additional monitoring wells, and discrete shallow groundwater sampling designed to address potential data gaps

within the shallow and fill the aquifer at the Fuller-O'Brien Property. The groundwater investigation was documented in a 2005 RCRA Facility Investigation (RFI), which determined that no further action was necessary. In its review of the report, DTSC concurred with the report's conclusion that "the shallow groundwater at the property does not present a risk to human health and the environment" with the exception of potential exposure of benthic receptors to undiluted concentrations of nickel in shallow groundwater.

DTSC required a further investigation, described in a "Pore Water Investigation Summary, 450 E. Grand Avenue, South San Francisco, California" (Pore Water Report), dated August 29, 2006. The Pore Water Report concluded that the nickel concentration did not pose an ecological risk to surface water and benthic receptors. DTSC approved the report on December 7, 2006, as well as the decommissioning of all remaining monitoring wells at the Fuller-O'Brien Property. The Corrective Action Process for the Fuller-O'Brien Property was closed by DTSC on August 8, 2008.

Plaintiffs challenge instead the conclusion that Defendants are entitled to a defense under CERCLA §101(40) and 107(r), respectively 42 U.S.C. 9601(40) and 9607(r), as bona fide prospective purchasers.

### 1. Plaintiffs cannot prevail on the motion unless they can convince the court that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed.

Plaintiffs assert that the defense cannot be satisfied because the three parcels were purchased before the date of enactment of the 2002 amendments to CERCLA. Two separate provisions of CERCLA bear on this question. One is CERCLA § 107(r), 42 U.S.C. § 9607(r), which creates an exception to the strict liability of § 107(a) for owners of property where a release of a hazardous substances has occurred:

(r) Prospective purchaser and windfall lien

(1) Limitation on liability

Notwithstanding subsection (a)(1) of this section, a bona fide prospective purchaser whose potential liability for a release or threatened release is based solely on the purchaser's being considered to be an owner or operator of a facility shall not be liable as long as the bona fide prospective purchaser does not impede the performance of a response action or natural resource restoration.

Section 107(r) does not define a "bona fide prospective purchaser." That definition appears in CERCLA § 101(40), 42 U.S.C. § 9601(40):

(40) Bona fide prospective purchaser.— The term "bona fide prospective purchaser" means a person (or a tenant of a person) that **acquires ownership of a facility after January 11, 2002**, and that establishes each of the following by a

preponderance of the evidence:

(A) Disposal prior to acquisition.— All disposal of hazardous substances at the facility occurred before the person acquired the facility.

(B) Inquiries.— (i) In general.— The person made all appropriate inquiries into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices in accordance with clauses (ii) and (iii).

(ii) Standards and practices.— The standards and practices referred to in clauses (ii) and (iv) of paragraph (35)(B) shall be considered to satisfy the requirements of this subparagraph.

(iii) Residential use.— In the case of property in residential or other similar use at the time of purchase by a nongovernmental or noncommercial entity, a facility inspection and title search that reveal no basis for further investigation shall be considered to satisfy the requirements of this subparagraph.

(C) Notices.— The person provides all legally required notices with respect to the discovery or release of any hazardous substances at the facility.

(D) Care.— The person exercises appropriate care with respect to hazardous substances found at the facility by taking reasonable steps to—

(i) stop any continuing release;

(ii) prevent any threatened future release; and

(iii) prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance.

(E) Cooperation, assistance, and access.— The person provides full cooperation, assistance, and access to persons that are authorized to conduct response actions or natural resource restoration at a vessel or facility (including the cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial response actions or natural resource restoration at the vessel or facility).

(F) Institutional control.— The person—

(i) is in compliance with any land use restrictions established or relied on in connection with the response action at a vessel or facility; and

(ii) does not impede the effectiveness or integrity of any institutional control employed at the vessel or facility in connection with a response action.

(G) Requests; subpoenas.— The person complies with any request for information or administrative subpoena issued by the President under this chapter.

(H) No affiliation.— The person is not—

(i) potentially liable, or affiliated with any other person that is potentially liable, for response costs at a facility through—

(I) any direct or indirect familial relationship; or

(II) any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by the instruments by which title to the facility is conveyed or financed or by a contract for the sale of goods or services); or

(ii) the result of a reorganization of a business entity that was potentially liable. [Emphasis added]

Defendants contend that they have satisfied all of the requirements of § 101(40)(A) through 101(40)(G), that the Fuller-O'Brien property was extensively investigated not only by one or more of Defendants by also by government agencies, including USEPA, prior to purchase in 1999, the conditions were identified through the due diligence measures required by §§ 101(40)(B) and 101(35)(B) (i)(I), and that no rational purpose is served by imposing liability on Defendants under CERCLA that would not be imposed on a party who purchased after January 11, 2002 who in other respects conducted itself in exactly the same way as Defendants. Defendants contend that such a limitation, applied to the facts of the present case, deny due process and violate the 5th Amendment to the United States Constitution. For that reason, Defendants contend that legitimate questions of law are in dispute and not clear and that this issue is not appropriate for a motion to strike. Further, Defendants contend that that the record should be more fully developed to establish whether the requirements of § 101(40)(A) through 101(40)(G) are satisfied and that it is premature to address the constitutional question on this motion.

**2. The restriction on immunity of liability as a bona fide prospective purchaser based on nothing more than the date of purchase is an arbitrary distinction that exposes that requirement to challenge under the Fifth Amendment as a violation of due process and makes this issue inappropriate for a motion to strike.**

The United States Supreme Court held in *Bolling v. Sharp*, 347 U.S. 497, 499 (1954) that while "[t]he Fifth Amendment . . . does not contain an equal protection clause, as does the Fourteenth Amendment, . . . the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The "equal protection of the laws" is a more explicit safeguard of prohibited unfairness than "due process of law," and therefore we do not imply that the two are always interchangeable phrases. But, as this Court has

recognized, discrimination may be so unjustifiable as to be violative of due process." Similarly, *Lyng v. Castillo*, 477 U.S. 635, 636-637, n. 2 (1986) says:

> The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). *Accord, e. g., United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 533 , n. 5 (1973); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

The standard by which a legislative act is examined under the due process clause is, of course, exceedingly deferential. According to *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313-314 (1993):

> In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. See *Sullivan v. Stroop*, 496 U. S. 478, 485 (1990); *Bowen v. Gilliard*, 483 U. S. 587, 600–603 (1987); *United States Railroad Retirement Bd. v. Fritz*, 449 U. S. 166, 174–179 (1980); *Dandridge v. Williams*, 397 U. S. 471, 484–485 (1970). Where there are "plausible reasons" for Congress' action, "our inquiry is at an end." *United States Railroad Retirement Bd. v. Fritz, supra*, at 179. This standard of review is a paradigm of judicial restraint. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley*, 440 U. S. 93, 97 (1979) (footnote omitted).6
>
> On rational-basis review, a classification in a statute such as the Cable Act comes to us bearing a strong presumption of validity, see *Lyng v. Automobile Workers*, 485 U. S. 360, 370 (1988), and those attacking the rationality of the legislative classification have the burden "to negative every conceivable basis which might support it," *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U. S. 356, 364 (1973) (internal quotation marks omitted). See also *Hodel v. Indiana*, 452 U. S. 314, 331–332 (1981). Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. *United States Railroad Retirement Bd. v. Fritz, supra,* at 179. See *Flemming v. Nestor*, 363 U. S. 603, 612 (1960). Thus, the absence of " 'legislative facts' " explaining the distinction "[o]n the record," 294 U. S. App. D. C., at 389, 959 F. 2d, at 987, has no significance in rational-basis analysis. See *Nordlinger v. Hahn*, 505 U. S. 1, 15 (1992) (equal protection "does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification"). In other words, a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. See *Vance v. Bradley, supra*, at 111. See also *Minnesota v. Clover Leaf Creamery Co.*, 449 U. S. 456, 464 (1981). "'Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.' " *Lehnhausen, supra*, at 365 (quoting *Carmichael v. Southern Coal & Coke Co.*, 301 U. S. 495, 510 (1937)).

These restraints on judicial review have added force "where the legislature must necessarily engage in a process of line-drawing." *United States Railroad Retirement Bd. v. Fritz*, 449 U. S., at 179. Defining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries— "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Ibid.* (internal quotation marks and citation omitted).

Against such a standard, if we were placing into question the general liability scheme of CERCLA, we would have no chance of success. But that is not the issue here. The question here is whether there is a rational basis for the distinction made in the 2002 amendments by which two parties in identical circumstances, using the same degree of due diligence in purchase of a contaminated property and the same level of care and cooperation in managing the property, separated only by a purchase date, have dramatically different exposures to liability.

Only two elements of the definition of a bona fide prospective purchaser must be satisfied prior to purchase and therefore have anything to do with the date of purchase. One is that, under § 101(40)(A), the "All disposal of hazardous substances at the facility occurred before the person acquired the facility." For two identical purchases of similar properties, one on January 11, 2002 and the other on January 12, 2002, both having contamination from a release on the same date, this requirement would be satisfied even if the release was decades before the property was acquired.

The other element that must occur prior to purchase is the "all appropriate inquiry" requirement of § 101(40)(B), which requires an investigation into previous ownership and uses of the facility "in accordance with generally accepted good commercial and customary standards and in accordance with clauses (ii) and (iii)." Clause (iii) concerns residential uses and is not pertinent to this action. Clause (ii) says:

> (ii) Standards and practices.— The standards and practices referred to in clauses (ii) and (iv) of paragraph (35)(B) shall be considered to satisfy the requirements of this subparagraph.

Paragraph (35)(B)(i)(I), the only part of Paragraph 35(B)(i) bearing on pre-purchase requirements, says:

> (B) Reason to know.— (i) All appropriate inquiries.— To establish that the

defendant had no reason to know of the matter described in subparagraph (A)(i), the defendant must demonstrate to a court that—

(I) on or before the date on which the defendant acquired the facility, the defendant carried out all appropriate inquiries, as provided in clauses (ii) and (iv), into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices; . .

Clauses (ii) through (iv) set the following criteria, none of which changed on January 11, **2002** except for the requirement in clause (ii) to establish new regulations for satisfying the all appropriate inquiries requirement by January **2004**. Clause (ii) says:

(ii) Standards and practices.— Not later than 2 years after January 11, 2002, the Administrator shall by regulation establish standards and practices for the purpose of satisfying the requirement to carry out all appropriate inquiries under clause (i).

Clause (iii) sets out the elements to be considered in adopting new regulations and is not pertinent to the present action. Clause (iv) adopts existing standards in the interim, and clause (iv)(II) is relevant to the current question:

(iv) Interim standards and practices. . .

(II) **Property purchased on or after May 31, 1997**.— With respect to property purchased on or after May 31, 1997, and **until the Administrator promulgates the regulations described in clause (ii)**, the procedures of the American Society for Testing and Materials, including the document known as "Standard E1527–97", entitled "Standard Practice for Environmental Site Assessment: Phase 1 Environmental Site Assessment Process", shall satisfy the requirements in clause (i). [Emphasis added]

Until the Administrator of EPA adopted regulations for all appropriate inquiries, a purchaser could qualify as a bona fide prospective purchaser under the May 31, 1997 ASTM Standard E1527-97. EPA's Proposed Rule: "Standards and Practices for All Appropriate Inquiries," 40 CFR Part 312, was published in the Federal Register on August 26, 2004 (69 Fed. Reg. 52541), but the final regulations were not issued until November 1, 2005 (70 FR 66070) and did not become effective until November 1, **2006**.

Consequently, the identical standard for due diligence in conducting a pre-purchase investigation existed from May 1997 until November 2006, spanning both the dates of purchase of the parcels in the present matter, 1999, and the date of enactment of the statement, 2002.

If the 2002 amendments adopted a more demanding standard for all appropriate inquiries to be applied immediately, there would be no question about it being sufficient justification for

restricting application of the exemption to sales occurring under the new standard. All purchases would have to meet that standard. That did not happen. Instead, for an extended period, nominally two years but actually four years, no additional investigation was required.

The question on this motion is not whether Defendants are correct that denying Defendants relief from potential liability under the 2002 amendments violates due process if the facts show that in all other respects they were in compliance with the requirements for bona fide prospective purchaser status. The question is only whether the law is so clear as to be beyond dispute. Therefore, at this stage of the case on a motion to strike, the rule does not apply that "in the field of economic legislation, 'the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.'" *Connolly v. PBGC*, 475 U.S. 211, 228-229 (1986), citing *Usery v. Turner Elkhorn Mining Co.*, 428 U. S. 1, 428 U. S. 15 (1976). Instead, the standard of decision is that described in *Security & Exchange Comm. v. Sands, supra,* 902 F.Supp. at 1165:

> To strike an affirmative defense, the moving party must convince the court 'that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed.' Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial § 9.381 (1995) (quoting *Systems Corp. v. American Telephone Telegraph*, 60 F.R.D. 692, 694 (S.D.N.Y. 1973).

No court has previously addressed the question posed here by Defendants and there exists no consensus among courts. It cannot be said that the law is so clear that a motion to strike is appropriate. The motion to strike therefore should be denied.

**C.    Plaintiffs' objections to the twenty-sixth affirmative defense (statute of frauds) do not support a motion to strike.**

Plaintiffs contend in Paragraphs 26-27 and in the "Fifteenth Cause of Action (Breach of Oral Contract) of the Complaint that "Cherokee" orally agreed to share the cost of implementing a workplan to respond to contamination on property outside the "Fuller-O'Brien" property. Defendants dispute that, and in response to Paragraphs 26-27 said in the answer that:

> 26.    Defendants aver that sometime prior to October 3, 2000, Arthur Lee Haskins and Richard Elmo Haskins ("Haskins Parties") and Cherokee San Francisco, LLC and Cherokee Grand Avenue, LLC ("Cherokee Parties") jointly submitted a Corrective Measure Workplan to the San Francisco Regional Water Quality Control Board ("Regional Board") for the former San Bruno Channel

property at 500 E. Jamie Court, South San Francisco ("San Bruno Channel Property"). The Regional Board and the Bay Conservation District Commission ("BCDC") required revisions to that workplan. On or about September 27, 2005, the Haskins Parties and the Cherokee Parties entered into a written Environmental Cost Sharing Agreement under which the Haskins Parties and Cherokee Parties agreed to equally share the costs of preparation and approval of a Revised Corrective Measures Workplan up to $13,000 each. Upon completion and approval of a revised workplan, the parties agreed to work together in good faith to develop a future cost sharing agreement for implementation of the workplan. On November 7, 2006, a Revised Corrective Measures Implementation Workplan was issued by their jointly retained consultant, EnviroAssets, Inc. Except as expressly averred herein, Defendants deny each and every allegation of paragraph 26.

27. Defendants aver that negotiations toward a written Remediation Cost Sharing Agreement were undertaken between the Cherokee Parties and the Haskins Parties and a third party, South San Francisco Scavenger Company, that was the current owner of 500 E. Jamie Court. Defendants further aver that efforts were made by the Cherokee Parties to engage Slough Estates USA, Inc., which purchased the Fuller-O'Brien Property from Cherokee San Francisco, LLC and Cherokee Grand Avenue, LLC in December 2000, and the City of South San Francisco, who had sewer outfalls in the former San Bruno Channel property, in the same discussions concerning cost-sharing. **Detailed drafts were circulated and negotiated but an agreement was never achieved with all of the intended parties**. Those drafts contemplated a potential three-way cost sharing for remediation work in the former San Bruno Channel Property, but the third party, South San Francisco Scavenger Company, withdraw for reasons related to conditions in its development permit with the Bay Conservation and Development Commission. Except as expressly averred herein, Defendants deny each and every allegation of paragraph 27.[Emphasis added]

Defendants then added a Twenty-Sixth Affirmative Defense (Statute of Frauds) which alleges:

Plaintiffs' allegations of an oral agreement are founded upon negotiations toward a written Remediation Cost Sharing Agreement that were undertaken between the Cherokee Parties, the Haskins Parties and South San Francisco Scavenger Company in or about 2007. The proposed agreement contained elements that were not intended to be completed within one year, including long term maintenance, monitoring and reporting that expressly was projected to require 3 to 5 years to complete following completion of the workplan. The Revised Corrective Measures Workplan allegedly to be implemented by the alleged oral agreement expressly provided that the project site would be monitored for five years as required by the regulatory agencies, including the United States Corps of Engineers and the Regional Water Quality Control Board. Plaintiffs' claim of an oral agreement based on those negotiations is unenforceable under California Civil Code Section 1624 as an agreement that by its terms is not to be performed within a year from the making thereof.

Plaintiffs seek to have the affirmative defense stricken, not on the basis of its content but rather on the contention that it is insupportable as a matter of fact. This is an improper use of a motion to strike.

### 1. Defendants have identified no basis on the face of the pleadings for granting the motion.

The affirmative defense on statute of frauds is based on California Civil Code Section 1624, which says in relevant part:

> 1624. (a) The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent:
>
> (1) An agreement that by its terms is not to be performed within a year from the making thereof. .

The allegations in the Twenty-Sixth Affirmative Defense are sufficient to place Plaintiffs' claim of oral agreement solidly within the framework of the prohibition of Section 1624:

> The proposed agreement contained elements that were not intended to be completed within one year, including long term maintenance, monitoring and reporting that expressly was projected to require 3 to 5 years to complete following completion of the workplan. The Revised Corrective Measures Workplan allegedly to be implemented by the alleged oral agreement expressly provided that the project site would be monitored for five years as required by the regulatory agencies, including the United States Corps of Engineers and the Regional Water Quality Control Board.

Plaintiffs contend that Defendants will be unable to prove these allegations, but that is not a matter that can be decided on a motion to strike, certainly not on the record offered by Plaintiffs.

### 2. The introduction of materials not on the face of the answer and not subject to judicial notice is improper in support of a motion to strike, and those materials cannot be relied up in deciding the motion.

Again, Plaintiffs' attempt to support the motion through the use of extrinsic evidence is improper. As stated earlier, "[t]he grounds for the motion must appear on the face of the pleading under attack of from matter which the court may judicially notice." *Security & Exchange Comm. v. Sands, supra*, 902 F. Supp. at 1165. This time they attempt to support the motion by offering as an exhibit to a declaration of counsel an unsigned draft of a three-party "Remediation Cost Sharing Agreement," which they contend to make a statute of frauds defense untenable. The declaration goes no further than to say, "A true and correct copy of the proposed Remediation Cost Sharing Agreement referenced in Cherokee's Twenty-Sixth Affirmative Defense is attached hereto as Exhibit 3."

1  The declaration and proposed exhibit are patently outside the face of the pleading under attack, and nothing suggests that either is judicially noticeable for the purpose of this notice. The declaration establishes no foundation whatever for asserting that the alleged "oral agreement" that an oral agreement was ever reached, or that the terms in the draft were approved by each of the three parties, which in the copy attached to the declaration includes South San Francisco Scavenger Co., an entity not a party in the present action. Further, the declarant, counsel for Plaintiffs, fails to establish a foundation for the authenticity document itself as evidence of an oral agreement from personal knowledge. The document and supporting declaration are inadmissible under FRE 601, 801, 802, 901 and 902.

## II. CONCLUSION

The pending motion is strong evidence for the school of thought that holds that motions to strike are disfavored. Wright & Miller, Federal Practice & Procedure: Civil 2d § 1380, at 647-49 (1990). Each of the questions raised would be better addressed after the evidence is developed following discovery. Occurring at the onset of the case, responding to this motion is an undue burden unjustified by the merits or the benefit to be obtained. The Joint CMC Statement does a far better job of clarifying the issues than this motion could have hoped to do.

Plaintiffs have failed to meet the standard for granting a motion to strike on any of the three points addressed. The use of extrinsic evidence is not permitted for this motion and, in any event, no foundation for the evidence has been provided in the supporting declaration. The motion should be denied.

Dated: March 2, 2012                    WENDEL, ROSEN, BLACK & DEAN LLP


By:   */s/*
      Stephen McKae
      Attorneys for Defendants
      Cherokee San Francisco, LLC, Cherokee
      Grand Avenue, LLC, Cherokee Acquisition
      Corp., and Cherokee Investment Partners,
      II, L.P.