1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
   GLENN A. FRIEDMAN, SB# 104442
2     Email: friedman@lbbslaw.com
   PAUL A. DESROCHERS, SB# 214855
3     Email: desrochers@lbbslaw.com
   ROBERT W. FARRELL, SB# 107461
4     Email: farrell@lbbslaw.com
   333 Bush Street, Suite 1100
5  San Francisco, California 94104-2872
   Telephone: 415.362.2580
6  Facsimile: 415.434.0882

7  Attorneys for Defendant
   FULLER O'BRIEN INC.

8

9                  UNITED STATES DISTRICT COURT

10      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11  RICHARD E. HASKINS, an individual;        CASE NO. CV-11-05142-JST
    ARTHUR L. HASKINS, an individual; and
12  ESTATE OF ARTHER "BUZZ" HASKINS,          **DECLARATION OF ROBERT W.**
    JR., DECEASED, a deceased individual,     **FARRELL IN SUPPORT OF MOTION BY ,**
13                                            **DEFENDANT FULLER O'BRIEN INC. TO**
                  Plaintiffs,                 **SET ASIDE DEFAULT AND DISMISS**
14                                            **ACTION PURSUANT TO FRCP RULE**
         vs.                                  **12(b)(5)**
15
    CHEROKEE INVESTMENT PARTNERS,             **Date:    April 18, 2013**
16  LLC, a North Carolina limited liability   **Time:    2:00 p.m.**
    company;    FULLER-O'BRIEN,    INC.,   a  **Crtrm.: 9, 19th Floor (San Francisco)**
17  surrendered Delaware Corporation; and DOES 1  **Judge:   Judge Jon S. Tigar**
    through 100,
18
                  Defendants.
19

20      I, Robert Farrell, declare and state as follows:

21      1.      I am an attorney licensed to practice law before all courts in the state of California and

22  the United States District Court for the Northern District of California. I am employed by the law firm

23  of Lewis Brisbois Bisgaard & Smith LLP, counsel for Defendant FULLER O'BRIEN ("FOB") in this

24  matter. I have personal knowledge of the facts set forth herein, except for those facts set forth on

25  information and belief which facts I believe to be true, and can testify competently thereto if requested

26  to do so.

27      2.      The California Supreme Court issued its opinion in the case of *Greb v. Diamond*

28  *International Corp.* (Cal. Supreme Court, February 22, 2013 Case No. S183365) on February 21,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    2013. A true and correct copy of the Supreme Court's opinion in *Greb v. Diamond International*

2 *Corp.* is attached hereto as **Exhibit A**.

3        3.      Attached hereto as **Exhibit B** is a true and correct copy of the relevant portions of the

4 Indiana corporate dissolution statute cited in this motion (Indiana Code §§ 23-1-45-1 and 23-1-45-7).

5        I declare under penalty of perjury under the laws of the United States of America and the State

6 of California that the foregoing is true and correct to the best of my knowledge and belief.

7

8 Dated: March 15, 2013            By:      /s/ ROBERT W. FARRELL

9                                       Robert W. Farrell

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ROBERT W. FARRELL IN SUPPORT OF MOTION BY DEFENDANT FULLER O'BRIEN INC. TO SET ASIDE DEFAULT AND DISMISS ACTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# EXHIBIT A

Filed 2/21/13

# IN THE SUPREME COURT OF CALIFORNIA

| | |
|---|---|
| WALTER GREB et al., | S183365 |
| Plaintiffs and Appellants, | |
| v. | Ct.App. 1/1 A125472 |
| DIAMOND INTERNATIONAL CORPORATION, | San Francisco City and County |
| Defendant and Respondent. | Super. Ct. No. CGC-08-274989 |

We granted review to resolve a conflict in the Courts of Appeal concerning interpretation of Corporations Code section 2010,[1] which governs the winding-up and survival of dissolved corporations. We consider whether the statute applies to foreign corporations — those formed in states other than California — and conclude, consistently with the appellate court below, that it does not.

## I. *Facts and procedure*

In December 2008, plaintiffs Walter Greb (now deceased) and his wife Karen Greb filed a complaint for personal injuries and loss of consortium against defendant Diamond International Corporation (defendant) and several other entities. Plaintiffs' complaint alleged injuries from exposure to asbestos. Although defendant has been dissolved for many years, plaintiffs sought recovery from unexhausted liability insurance that covered defendant during the decades when it did business in California. (See

---

[1] All further statutory references are to this code unless otherwise noted.

1

§ 2011, subd. (a)(1)(A) [permitting recovery against dissolved corporations from "undistributed assets, including . . . any insurance assets"].)

Defendant demurred to plaintiffs' complaint, alleging that more than three years earlier, in July 2005, it had obtained a corporate dissolution pursuant to the laws of Delaware, defendant's state of incorporation. Accordingly, defendant argued, pursuant to Delaware's three-year survival statute,[2] when plaintiffs filed their complaint in December 2008, defendant lacked the capacity to be sued. Plaintiffs opposed the motion, arguing their action was permitted under California's own survival statute, section 2010, which they asserted takes precedence over Delaware law in this setting.

The trial court ruled that California's survival statute did not apply to foreign corporations, and hence that Delaware's corresponding statute applied to defendant. Accordingly, the trial court sustained the demurrer without leave to amend, and dismissed plaintiffs' complaint with prejudice. On review, the Court of Appeal affirmed. It followed the interpretation of section 2010 set out in dicta in two prior appellate court decisions — *North American Asbestos Corp. v. Superior Court* (1982) 128 Cal.App.3d

[2]    Delaware General Corporation Law section 278 provides, in part: "All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery." (Del. Code Ann. tit. 8, § 278.)

138 (*North American I*), and *Riley v. Fitzgerald* (1986) 178 Cal.App.3d 871 (*Riley*) —

and disagreed with the holding concerning that statute set out in a third appellate court

decision, *North American Asbestos Corp. v. Superior Court* (1986) 180 Cal.App.3d 902

(*North American II*). As noted, we granted review to resolve the conflict.[3]

## II. *Discussion*

Section 2010 provides in relevant part: "(a) A corporation which is dissolved

nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and

defending actions by or against it and enabling it to collect and discharge obligations,

dispose of and convey its property and collect and divide its assets, but not for the

purpose of continuing business except so far as necessary for the winding up thereof."[4]

Like the law in a few other states, the section sets no time limitation for suing a dissolved

corporation for injuries arising from its predissolution conduct; the sole temporal

limitation to such a suit is found in the applicable statute of limitations relating to each

cause of action. As we explained in *Penasquitos, Inc. v. Superior Court* (1991) 53 Cal.3d

1180, 1190 (*Penasquitos*): "Under our statutory scheme, the effect of dissolution is not

so much a change in the corporation's status as a change in its permitted scope of

---

[3]     In the Court of Appeal, the parties stipulated to a dismissal of this case, but the
appellate court elected to proceed with the opinion because the appeal had been fully
briefed and raised issues warranting an opinion. (See Eisenberg et al., Cal. Practice
Guide: Civil Appeals and Writs (The Rutter Group 2009) ¶ 5:63, pp. 5-23 to 5-24.) We
agree with the Court of Appeal's conclusion in this regard.

[4]     The rest of section 2010 reads in full: "(b) No action or proceeding to which a
corporation is a party abates by the dissolution of the corporation or by reason of
proceedings for winding up and dissolution thereof. [¶] (c) Any assets inadvertently or
otherwise omitted from the winding up continue in the dissolved corporation for the
benefit of the persons entitled thereto upon dissolution of the corporation and on
realization shall be distributed accordingly."

activity. . . . Thus, a corporation's dissolution is best understood not as its death, but merely as its retirement from active business."

The parties agree that if section 2010 does not apply to a dissolved foreign corporation, defendant's capacity to be sued would be governed solely by Delaware's corresponding survival statute — and that law would bar plaintiffs' claims against defendant. (See, e.g., *In re RegO Co.* (Del.Ch. 1992) 623 A.2d 92, 96 [Del.'s three-year survival law precludes suit against a dissolved corporation even when the plaintiff did not know of the injury during that period].) If, on the other hand, California's section 2010 applies to a dissolved foreign corporation, a court would then be required to perform a choice-of-law analysis in order to determine which state's law should apply and govern defendant's capacity to be sued. (See *Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 107-108 (*Kearney*) [describing the traditional three-step choice-of-law inquiry].)[5]

We proceed to describe the conflict in the appellate decisions concerning whether section 2010 applies to dissolved foreign corporations.

---

[5]    As we explained in *Kearney*: "First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law 'to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state' [citation], and then ultimately applies 'the law of the state whose interest would be the more impaired if its law were not applied.' [Citation.]" (*Kearney, supra,* 39 Cal.4th at pp. 107-108.) The circumstance that "two states are involved does not in itself indicate that there is a 'conflict of laws' or 'choice of laws' problem." (*Offshore Rental Co. v. Continental Oil Co., Inc.* (1978) 22 Cal.3d 157, 161-162.)

4

## A. *The conflicting appellate court decisions*

### 1. North American I

In *North American I*, the plaintiffs, California residents, sued the defendant, an Illinois corporation, in California for asbestos-related personal injuries suffered in California. Under the corporate survival law of Illinois, a corporation can be sued for two years after it files for dissolution. The suit was filed more than two years after the defendant had dissolved. (*North American I, supra*, 128 Cal.App.3d at p. 141.)

The defendant moved to quash service of process, arguing it lacked the capacity to be sued under Illinois law. The trial court denied the motion, and the Court of Appeal denied the defendant's writ petition, holding that service was proper and the appropriate method for the defendant to assert its lack of capacity to be sued was by demurrer or motion for judgment on the pleadings. In dicta, the court stated that should the case go forward (and a court be required to determine whether the defendant had the capacity to be sued) it was "clear that the California survival law does not apply to suits against dissolved foreign corporations." (*North American I, supra*, 128 Cal.App.3d at p. 143.) The court based this conclusion on section 102, subdivision (a) (hereafter section 102(a)). (*North American I, supra,* at p. 144.)

Section 102(a) specifies that the provisions of division 1 (the General Corporation Law) apply to (1) all "corporations organized under this division"; (2) specified "domestic corporations"; and (3) "other" corporations only to the extent the provisions of the code "expressly include[]" them.[6]

---

[6]     Before quoting section 102(a) in full, it is useful to briefly describe the structure of the Corporations Code. The code is divided into various titles — title 1 (corporations), title 2 (partnerships), title 3 (limited liability companies), etc. Within title 1, there are four divisions: division 1 (General Corporation Law), division 1.5 (the Corporate Flexibility Act of 2011), division 2 (nonprofit corporations) and division 3 (corporations

*(footnote continued on next page)*

The court in *North American I* construed section 102(a) as providing that "with certain exceptions not applicable here the provisions of the Corporations Code apply only to *domestic corporations* and that application to other corporations is permitted only 'to the extent expressly included in a particular provision of this division.' " (*North American I, supra*, 128 Cal.App.3d at p. 144, italics added.) The court observed that the survival statute, section 2010, "is in chapter 20 of division 1, which is entitled 'General Provisions Relating to Dissolution.' Nowhere is there any mention that the provisions of that chapter or of section 2010 apply to foreign corporations. Foreign corporations are the subject of the entire next chapter, chapter 21." (*North American I, supra*, at p. 144.)

In addition, the court in *North American I* relied on a then decades-old law review note, *Foreign Corporations: Continuance of Existence After Dissolution* (1947) 35 Cal. L.Rev. 306. The note addressed the common law's treatment of dissolved corporations,[7]

---

*(footnote continued from previous page)*

for specific purposes). Each division is subdivided into chapters and articles; divisions 2 and 3 are further divided into designated parts.

Chapter 1 (general provisions and definitions) of title 1, division 1, includes section 102(a), which provides in full: "Subject to Chapter 23 (commencing with Section 2300) (transition provisions), this division applies to *corporations organized under this division* and to *domestic corporations* that are not subject to Division 1.5 (commencing with Section 2500), and to *domestic corporations* that are not subject to Division 2 (commencing with Section 5000) or Part 1 (commencing with Section 12000), 2 (commencing with Section 12200), 3 (commencing with Section 13200), or 5 (commencing with Section 14000) of Division 3 on December 31, 1976, and that are not organized or existing under any statute of this state other than this code; *this division applies to any other corporation only to the extent expressly included in a particular provision of this division.*" (Italics added.)

[7]     Under the common law, as with a deceased person, a dissolved corporation could not sue or be sued. (*Crossman v. Vivienda Water Co.* (1907) 150 Cal. 575, 580; see Comment, *Corporations f  Dissolution f  Directors as Trustees* (1913) 1 Cal. L.Rev. 266 [describing the common law rule and the practical problems it caused, and proposing a statute like those then in other states, "forfeiting the right of [a dissolved] corporation to

*(footnote continued on next page)*

6

and California's then relatively new survival statue, enacted in 1929 — Civil Code former section 399, the direct predecessor of current Corporations Code section 2010. The note observed that "some courts, relying on the general policy of their corporation statutes, have held that the [survival] law of the forum applies to foreign as well as domestic corporations" and that in view of high court authority "[i]t is settled that such an extension is valid." (35 Cal. L.Rev. at pp. 308-309, fns. omitted.) After analyzing the existing California statutes — including Civil Code former section 278, which provided a narrow definition of the term "corporation" that expressly excluded foreign entities — the note author concluded that because California's survival statue did not expressly provide that foreign corporations were included within its scope, the statute "could hardly be applied to foreign corporations." (35 Cal. L.Rev. at p. 309; see *id.*, fn. 23.) The author proposed that "for the protection of the corporation, the public, and creditors" the statute should be amended to apply as well to foreign corporations. (35 Cal. L.Rev. at p. 309.) But, as the court in *North American I* observed, "[n]o such amendment has taken place." (*North American I, supra,* 128 Cal.App.3d at p. 144.)

The court in *North American I* reasoned that these statutory provisions and this history led to the conclusion that "the California survival law does not apply to suits against dissolved foreign corporations." (*North American I, supra,* 128 Cal.App.3d at p. 143.)

2. Riley

In *Riley, supra,* 178 Cal.App.3d 871, the plaintiffs, who were the sole shareholders of a dissolved Texas corporation and assignees of its assets, sued on behalf of themselves

---

*(footnote continued from previous page)*

do business, but preserving its existence for two years at least, for the sole purpose of suing and being sued"].)

and the dissolved corporation, seeking to recover damages sustained by the Texas corporation prior to its dissolution. The plaintiffs charged the defendants, California and Texas residents, with fraud and breach of fiduciary duty. Prior to the action, the parties had stipulated that the plaintiffs' capacity to sue would be the same as that of the Texas corporation under that state's corporate survival law. Texas law provides that a corporation continues to exist for three years after dissolution for the purpose of winding up its affairs, suing, and being sued. The suit was filed more than three years after the Texas corporation dissolved. (*Id.*, at p. 874.)

The defendants in *Riley* moved for judgment on the pleadings, asserting that the plaintiffs lacked capacity to sue under Texas law. The trial court granted the motion. The Court of Appeal affirmed, finding that the plaintiffs had agreed to be bound by Texas law, which applied and barred suit. (*Riley, supra,* 178 Cal.App.3d at pp. 877-883.) And in any event, the court stated in dicta, California's survival statute, section 2010, did not apply to foreign corporations. (*Riley, supra,* at pp. 875-877.)

Addressing that latter question, the court first cited case law from both California and Texas standing for the proposition that "the effect of corporate dissolution or expiration depends upon the law of [the corporation's] domicile." (*Riley, supra,* 178 Cal.App.3d at p. 876.)[8] The court found that "[n]othing in the California Corporations

---

[8]     The court cited three appellate court decisions, *Fidelity Metals Corp. v. Risley* (1946) 77 Cal.App.2d 377, 381, *J.C. Peacock, Inc. v. Hasko* (1960) 184 Cal.App.2d 142, 150, and *Lewis v. LeBaron* (1967) 254 Cal.App.2d 270, 278-279. It further signaled, "[s]ee also" two older decisions of this court, *Anderson v. Derrick* (1934) 220 Cal. 770, 775, and *Crossman v. Vivienda Water Co., supra,* 150 Cal. at page 580. All of these cases reflect the common law rule, which in turn is generally echoed in the Restatement Second of Conflict of Laws (1971), section 299 ("(1) Whether the existence of a corporation has been terminated or suspended is determined by the local law of the state of incorporation. [¶] (2) The termination or suspension of a corporation's existence by the state of incorporation will be recognized for most purposes by other states."). But as

*(footnote continued on next page)*

Code indicates that this long-held principle has been overruled or superseded by statute."
(*Riley,* at p. 876.) In reaching its conclusion the court relied substantially on section
2115, located in chapter 21 (foreign corporations) of division 1, the General Corporation
Law.

Section 2115 was enacted as part of a comprehensive revision of the Corporations
Code in the mid-1970s. The section addressed so-called pseudo-foreign corporations —
entities incorporated outside California, but that meet two tests: (1) the corporation
transacts more than half of its business (as measured by various objective criteria) in
California, and (2) a majority of the voting securities are held by California residents.
(See § 2115, subd. (a)(1) & (2).) Such foreign corporations must abide by numerous
specified statutes within division 1, the General Corporation Law — provisions that
govern corporate "internal affairs" and would not otherwise apply to foreign entities.[9]
This statute, which survived multiple challenges to its constitutionality in *Wilson v.
Louisiana-Pacific Resources, Inc.* (1982) 138 Cal.App.3d 216,[10] further mandates

---

(*footnote continued from previous page*)

we will see, this deferential approach has been eroded by statutes and judicial
construction.

[9]    Section 2115, subdivision (b) subjects such foreign corporations to governance by
the following provisions of division 1, the General Corporation Law. Chapter 1 "(general
provisions and definitions), to the extent applicable to the following provisions":
portions of chapters 3 (directors and management), 5 (dividends and reacquisitions of
shares), 6 (shareholders' meetings and consents), 7 (voting of shares), 10 (sales of assets),
and 11 (merger); all of chapters 12 (reorganizations) and 13 (dissenters' rights); portions
of chapter 15 (records and reports); and all of chapter 16 (rights of inspection).

[10]    The court considered and rejected federal and state constitutional challenges to the
statute based on claims including the full faith and credit clause, the commerce clause,
the due process clauses, the contract clauses, and the equal protection clauses. (*Wilson v.
Louisiana-Pacific Resources, Inc., supra,* 138 Cal.App.3d at pp. 222-231.)

adherence to these provisions "to the exclusion of the law of the jurisdiction in which it is incorporated." (§ 2115, subd. (b).)

In concluding that the survival statute did not apply to foreign corporations, the appellate court in *Riley* observed that the statute is part of chapter 20, which concerns dissolution, and is not listed in section 2115 of chapter 21, setting out the statutes that apply to the foreign corporations that have the most extensive contacts with California. (*Riley, supra,* 178 Cal.App.3d at p. 876.) Finally, the court in *Riley* also found support for its conclusion in *North American I*'s analysis, described earlier. (*Riley, supra,* at pp. 876-877.)

### 3. North American II

*North American II* involved the same defendant as *North American I*. And as in that earlier case, the plaintiff, a California resident, filed a personal injury action against the dissolved Illinois corporation, seeking compensation for asbestos-related injuries. Again, suit was filed more than two years after the defendant had dissolved. The defendant moved for summary judgment, asserting it lacked the capacity to be sued under the Illinois two-year survival law. The trial court denied the motion, ruling that California's survival statute, section 2010, applied to the defendant. (*North American II, supra,* 180 Cal.App.3d at p. 905.)

The Court of Appeal, First Appellate District, Division Three — the same division that had decided *North American I* — affirmed in a two-to-one decision, with Justice Scott, the author of *North American I*, in dissent.

In concluding that section 2010 applied to foreign corporations, the majority in *North American II* did not address *Riley, supra,* 178 Cal.App.3d 871, which had been filed almost two months earlier. It acknowledged that its new conclusion "deviates from the dicta in [*North American I*], where this court said that Corporations Code section 2010 applied only to domestic corporations." (*North American II, supra,* 180 Cal.App.3d at p. 908.) The court explained that "[o]n further reflection and examination of some of

10

the history behind Corporations Code section 2010 and related provisions of corporation law, we have concluded that section 2010 should not be so read under the circumstances of the case at bench, but should be read to protect the interests of California." (*Ibid.*)

The majority in *North American II* observed that in 1929, when the predecessor to section 2010 was enacted, the state Constitution contained a since-repealed clause — included in the California Constitution of 1879 — providing that "[*n*]*o corporation organized outside the limits of this State shall be allowed to transact business within this State on more favorable conditions than are prescribed by law to similar corporations organized under the laws of this State.*" (Cal. Const., art. XII, former § 15 [repealed in 1972], italics added.) The majority stated that pursuant to this former constitutional provision "a statute placing an obligation on a domestic corporation, such as one permitting suit against it long after its dissolution, would be read as placing a similar burden on a foreign corporation licensed to transact intrastate business in California . . . ." (*North American II, supra,* 180 Cal.App.3d at p. 908.)

The majority in *North American II* reasoned, "Article XII, section 15, was in effect when the original version of Corporations Code section 2010, applying survival law to '[*all*] corporations,' was adopted . . . . [A]t that time Civil Code section 283 . . . stated that the provisos of its title were applicable to 'every private corporation,' " and "[m]any other sections [of the statutory scheme as originally adopted in 1929] specified 'domestic corporation' or 'foreign corporation' when such a limitation was intended [citations]. *Thus, in 1929 it was clear that California's survival law applied to both foreign and domestic corporations.*" (*North American II, supra,* 180 Cal.App.3d at p. 908, italics added.)

The appellate court majority acknowledged that very soon after enactment of the survival statute in 1929, the Legislature in 1931 narrowly defined the term "corporation" as meaning — unless expressly provided otherwise — "only a domestic corporation." (*North American II, supra,* 180 Cal.App.3d at p. 908 [referring to Civ. Code, former

11

§ 278, as added by Stats. 1931, ch. 862, § 2, p. 1764, & amended by Stats. 1933, ch. 533, § 1, p. 1358].) This definition continued in force until 1977, when the existing Corporations Code was repealed and replaced with the current code, which included corresponding new sections 102(a) (quoted *ante*, fn. 6) and 162[11] — each of which similarly limits the applicability of the various statutes set out in division 1 of the new Corporations Code, and the term "corporation" as used in that new code. The majority in *North American II* conceded that in light of these various provisions, "the term 'corporation' used in [the survival statute,] . . . section 2010 *could arguably have come to mean only a domestic corporation.*" (*North American II, supra*, 180 Cal.App.3d at p. 908, italics added.) The appellate court found, however, that the "circumstances of the repeal of article XII, section 15, show that *no such change in the law was intended* and that gₒ][ₒ]ₐ,Tₙhₐₓ ᵤₛₑ𝒹 T ₛₑ𝒸,Tₙ -ₒ,ₒ *[and its predecessors] still has its original meaning, covering both domestic and foreign corporations* to the extent that foreign corporations will not receive more favorable treatment than domestic corporations." (*Id.*, at pp. 908-909, italics added.)[12]

---

[11]    Section 162 defines the term "corporation," "unless otherwise expressly provided," to mean "only . . . a corporation organized under this division or a corporation subject to this division under the provisions of subdivision (a) of Section 102." Section 167 provides, " 'Domestic corporation' means a corporation formed under the laws of this state"; correspondingly, section 171 provides, " 'Foreign corporation' means any corporation other than a domestic corporation" but does "not include a corporation . . . chartered under the laws of the United States."

[12]    The majority in *North American II* explained the basis for this conclusion: "Repeal of article XII, section 15, was first proposed in 1967 by the Article XII Committee of the Constitution Revision Commission (Minutes of the Meeting of the Constitution Revision Commission, February 16, 1967 [at p. 2]). The committee suggested deletion of section 15 because '[t]he section can be dealt with by statute. The committee recommended deletion of the entire section.' (*Ibid.*) The report of the California Constitution Revision Commission, dated 1968, page 92, proposed repeal of section 15 with the following comment: 'Equal treatment of foreign and domestic

*(footnote continued on next page)*

The majority in *North American II* continued: "Because the electorate did not intend to change the law by repeal of article XII, section 15, we read the term 'corporation' in Corporations Code section 2010 to have its *original meaning* when we are dealing with the question of whether a foreign corporation will receive more favorable treatment than a domestic corporation, that is, to include both domestic and foreign corporations. Though the Legislature added definitional sections in 1931 [citation] and took other steps to tighten up the language of the corporation laws, *it never took deliberate action to abrogate the original policy of treating foreign corporations no more favorably than domestic corporations with respect to their capacity to be sued*. Nor did the electorate take action intended to exempt foreign corporations from the California survival law. We read section 2010 in accordance with the intentions of both the Legislature and the electorate." (*North American II, supra*, 180 Cal.App.3d at p. 909, italics added.)

The majority in *North American II* next addressed and rejected the suggestion that section 2115 — which, as observed earlier, had been relied upon by the court in *Riley* — should lead to a different conclusion. (*North American II, supra*, 180 Cal.App.3d at pp. 909-910.)[13] In closing, the majority observed that there is no constitutional

*(footnote continued from previous page)*

corporations is assured by other provisions of the California and Federal Constitutions. The transaction of business in California by foreign corporations also is governed by extensive statutes. This Section therefore is deleted as unnecessary.' After being defeated twice at the polls, the proposal to repeal article XII, section 15 (along with several other provisions), was approved at the primary election held June 6, 1972. The ballot argument supporting repeal stated only that the proposition approved was 'basically a housekeeping measure to eliminate obsolete and unnecessary words from the Constitution. No new material is added to the Constitution, and there is no change in law or policy.' " (*North American II, supra*, 180 Cal.App.3d at p. 909.)

[13] The majority reasoned: "Section 2115 subjects certain foreign corporations with extensive property, payroll, sales, and shareholders in California to a panoply of

*(footnote continued on next page)*

impediment to a state's subjecting foreign corporations to the burdens of its own survival statue. (*North American II*, at p. 910.)[14]

---

*(footnote continued from previous page)*

provisions of the California Corporations Code. Missing from the list is Corporations Code section 2010. Petitioner contends that this omission mandates a finding that section 2010 applies only to domestic corporations and not to either purely foreign corporations or to the 'quasi-foreign' corporations targeted by Corporations Code section 2115. However, petitioner[']s reasoning is flawed, and we read no significance from section 2115's silence about section 2010. It is evident from scrutiny of the list of provisions applied to 'quasi-foreign' corporations that they cover the mechanics of corporate life" — so-called "internal affairs" — "which would ordinarily be directed just to domestic corporations. Stated in general terms, section 2115 merely provides that when a foreign corporation conducts more than one-half of its business in California and has more than one-half of its shareholders in the state, it will be subject to certain statutory provisions usually reserved for domestic corporations. There is no indication that in enacting section 2115 the Legislature even considered the question of whether a foreign corporation should survive for purposes of suit. It is apparent that the Legislature felt that the provisions encompassed in section 2115 should only apply to foreign corporations if the specified percentages for business and share holdings in our state were reached, but this does not indicate any intention on the part of our lawmakers that other provisions of the law may not be applicable to foreign corporations. There are a myriad of statutory provisions that apply to foreign corporations that are not included in section 2115. And the absence of these statutory provisions from section 2115 is for a good reason, because they apply to all foreign corporations, not just to corporations which meet the percentage figures prescribed in section 2115." (*North American II, supra*, 180 Cal.App.3d at pp. 909-910.)

14    The court stated: "This question was answered by the United States Supreme Court in *Clark v. Williard* [(1934)] 292 U.S. 112. In circumstances similar to these, the court considered an argument that the corporation's capacity for suit should be determined by application of the law of its domicile. The court found, however, that the cited cases expressed a rule that was 'to be applied when there is no statute or public policy to the contrary in the state where the foreign corporation has been licensed to do business. They do not delimit the capacity of a state, when granting such a license, to subject it to conditions.' (*Id.*, at p. 119.)" (*North American II, supra*, 180 Cal.App.3d at p. 910.) The majority observed that the foreign corporation in the matter before it had been licensed to conduct business in California when its activities within the state gave rise to the lawsuit, and concluded that section 2010, as construed, could properly govern suits against the foreign corporation. (*North American II, supra,* at p. 910.)

Justice Scott, who authored the unanimous opinion in *North American I*, dissented, maintaining that section 2010 did not apply to dissolved foreign corporations. Justice Scott relied on the reasoning set out in *North American I, supra,* 128 Cal.App.3d 138, and he rejected the majority's analysis concerning the pseudo-foreign corporation statute, section 2115. (*North American II, supra,* 180 Cal.App.3d at pp. 911-913 (dis. opn. of Scott, J.).)

Specifically disagreeing with the majority's analysis regarding the repealed constitutional provision (Cal. Const., art. XII, former § 15), Justice Scott wrote: "The only significant change since the decision in *North American I* is the majority's discovery of reports showing that the Constitution Revision Commission and the electorate may not have realized the full impact of the decision to repeal article XII, section 15 of the California Constitution. But no amount of electoral error in repealing article XII, section 15, can supply a missing word to Corporations Code section 2110. Whether the electorate realized it or not, repeal of article XII, section 15, removed the only bar to treating foreign corporations more favorably than domestic corporations with regard to corporate survival as the Legislature most clearly has done." (*North American II, supra,* 180 Cal.App.3d at p. 913 (dis. opn. of Scott, J.).)

### B. *The decision below*

The Court of Appeal below agreed generally with *North American I, supra,* 128 Cal.App.3d 138, and *Riley, supra,* 178 Cal.App.3d 871 — and disagreed with *North American II, supra,* 180 Cal.App.3d 902 — concluding that section 2010 does not apply to a dissolved foreign corporation. In reaching that determination, the appellate court relied on three provisions of the Corporations Code described earlier: section 102(a), which, the court found, limits the application of the provisions of the code solely to certain domestic corporations, unless a provision expressly provides otherwise; section 162, which, considered with section 102(a), the court found, evinces "a clear intent to limit the Corporations Code's general application to domestic corporations"; and section

2115, which, the court noted, "identifies all of the chapters and sections of the Corporations Code that apply to foreign corporations meeting certain threshold requirements, [but] does not mention section 2010."

Having found the statutory scheme sufficiently clear on its face, the appellate court below dismissed as "somewhat convoluted" — and in any event irrelevant — the constitutional analysis that influenced the majority in *North American II*. The court viewed plaintiffs' argument in this regard as a facet of the statutory construction issue, and wrote: "Repeating the reasoning of *North American II*, plaintiffs here contend the 1972 repeal of article XII, section 15, of the California Constitution shows a legislative intent that California Corporations Code section 2010 apply to foreign corporations. It is well established, however, that legislative intent should not be resorted to where a statute is clear on its face. 'In determining legislative intent, courts look first to the words of the statute itself: if those words have a well-established meaning, as we hold they do here, there is no need for construction and courts should not indulge in it.' [Citation.]" The appellate court below did not otherwise address the constitutional arguments raised by the majority in *North American II*, or by plaintiffs in this case.

### C. *Contentions and analysis*

Plaintiffs advance alternative arguments in support of their assertion that the survival statute, section 2010, applies to dissolved foreign corporations. First, they assert that the Corporations Code, properly construed, renders foreign corporations like defendant subject to the statute — and they also argue that such an interpretation would promote sound policy objectives. Second, plaintiffs assert that even if the code does not make foreign corporations subject to California's survival statute, California's Constitution mandates that same result. We address these arguments in turn.

16

1. *Do section 102(a) and related provisions render foreign corporations like defendant subject to section 2010, the survival statute?*

As alluded to earlier, the statutes governing the formation, conduct, and existence of business (for profit) corporations in California are found in the many chapters and scores of sections of title 1, division 1, the General Corporation Law, sections 1-2319.[15] Plaintiffs rely primarily on section 102(a) (quoted in full *ante*, fn. 6), which as noted earlier defines the application of the General Corporation Law, and its numerous statutory provisions, including section 2010. Reduced to its essence as relevant here, section 102(a) specifies that the General Corporation Law, division 1, applies to (1) *"corporations organized under this division,"* to (2) certain *"domestic corporations"* and to (3) *"any other corporation only to the extent expressly included in a particular provision of this division."* (Italics added.)[16]

Plaintiffs assert that section 102(a) and related provisions disclose legislative intent to apply the survival statute, section 2010, to foreign corporations like defendant that transact business in California. As explained below, we disagree.

The parties concur that the second and third categories of corporations subject to the General Corporation Law under section 102(a) are not implicated in the present case. The second category was adopted to make it clear that the comprehensive mid-1970s amendments to the General Corporation Law applied not only to *future* entities "organized under" it, but also to the many *existing* domestic corporations organized under

---

15    Other types of corporations — nonprofit, "flexible," and those for specific purposes — are addressed in title 1, division 1.5 (§§ 2500-3500), division 2 (§§ 5002-10840) and division 3 (§§ 12000-14550).

16    Correspondingly, as observed *ante*, footnote 11, section 162 defines the term "corporation" — "unless otherwise expressly provided" — to mean "only . . . a corporation *organized under this division or a corporation subject to this division under the provisions of subdivision (a) of Section 102.*" (Italics added.)

17

prior California laws.[17] But defendant is not a domestic corporation, and hence does not fall within that category. And unlike some other sections within division 1 that expressly apply to "other" (including foreign) corporations,[18] section 2010, the survival statute, does not.

This leaves the first category set out in section 102(a) — "corporations organized under this division." Based on this language, it would appear to be doubtful that defendant is a corporation within that category. The phrase "organized under," given its ordinary usage, would seem to relate to the fundamental creation and structuring of a corporation — matters governed by division 1, chapter 2 (organization and bylaws), sections 200-213. Defendant, incorporated in Delaware, clearly was not formed or created under division 1, the General Corporation Law.

Plaintiffs nevertheless insist that defendant was indeed "organized under division 1." They reason as follows: (i) The code defines the term "domestic corporation" as "a corporation *formed under the laws of this state*" (§ 167, italics added); (ii) by using the different phrase *"organized under this division"* in section 102(a), the Legislature must have intended to draw a distinction between "domestic" corporations and those "organized under" division 1 — and hence to include within the category of corporations subject to division 1, the General Corporation Law, those foreign corporations that

---

[17]     See, e.g., the legislative committee comments to division 1, chapter 23 (transition provisions): "Section 102 provides that the new law is applicable to any corporation organized under it or to any business or private corporation organized under predecessor laws . . . ." (Legis. Com. com., 2 Deering's Ann. Corp. Code (2009 ed.) p. 599.)

[18]     For examples of provisions expressly applying to foreign corporations, see sections 208 (authorization of and limitations on contracts by corporations), 1108, subdivisions (a)-(f) (merger of corporations), 1157, subdivisions (a)-(f) (conversion of other entities into corporations), 1501, subdivision (g) (annual report to shareholders), 1600, subdivision (d) (shareholders' rights of inspection), 1602 (director's right of inspection), and 2260 (penalty provisions).

18

transact business in the this state; (iii) defendant qualifies as being "organized under this division" because under division 1, chapter 21 (foreign corporations) defendant was subject to various requirements, which plaintiffs characterize as "organizational mandates for transacting intrastate business" in California.

Specifically, as plaintiffs observe, pursuant to chapter 21 of division 1 all "foreign corporations transacting intrastate business" in California (§ 2100)[19] must not only obtain a certificate of qualification to do so (§ 2105, subd. (a)) but must also set up and consent to a California agent for service of process, pay state fees, select a permissible corporate name for use in California, and continually update and amend their filings here. (§§ 2105, subd. (a)(4) & (5)(A) [accepting service of process], 2106, subds. (a) [paying "fees required by law"] & (b) [using a corporate name that does not conflict with a Cal. business], 2107 [duty to update and amend all required filings].) These requirements of chapter 21, plaintiffs assert, constitute "organizational mandates" that, in turn, render each foreign corporation that complies with them "organized under" division 1.

Defendant observes in its answer brief that nothing in these statutes governing qualification to transact business in California refers to such requirements as "organization," or as plaintiffs characterize them, "organizational mandates." Nor, defendant asserts, does the code contemplate that a foreign corporation is " 'organized' under California law simply by virtue of qualifying to transact interstate business." Neither, defendant argues, did the Legislature contemplate that a corporation could be "organized" under the laws of more than one state.[20] And yet, defendant asserts, under

---

[19] The Corporations Code defines "transact[ing] intrastate business" as "entering into *repeated and successive* transactions of its business in this state." (§ 191, italics added.)

[20] When referring to where a corporation is organized, the code uniformly speaks of "the jurisdiction" or "the state" in the singular. (See §§ 317, subd. (i), 1108, subd. (d), 1109, 1113, subd. (j)(4), 1152, subd. (a)(5), 1155, subd. (b)(3), 1156, subd. (a), 2101, subd. (b), 2105, subd. (a)(1), 2112, subd. (a)(1).)

plaintiffs' theory a corporation would be "organized" under the laws of every state where it qualifies to conduct business — with profound consequences.

As defendant observes, under plaintiffs' reading of section 102(a), "*every* foreign corporation that qualified to do business in California would be governed by *all* of division 1"[21] — including all of California's myriad provisions in division 1 relating to organization and bylaws (ch. 2, §§ 200-213), directors and management (ch. 3, §§ 300-318), shares and share certificates (ch. 4, §§ 400-423), dividends and reacquisitions of shares (ch. 5, §§ 500-508), shareholders' meetings and consents (ch. 6, §§ 600-605), voting of shares (ch. 7, §§ 700-711), shareholder derivative actions (ch. 8, § 800), amendment of articles (ch. 9, §§ 900-911), sale of assets (ch. 10, §§ 1000-1002), merger (ch. 11, §§ 1100-1113), dissenters' rights (ch. 13, §§ 1300-1313), records and reports (ch. 15, §§ 1500-1511), rights of inspection (ch. 16, §§ 1600-1605), dissolution (chs. 18-20, §§ 1800-1809, 1900-1907, 2000-2011), and crimes and penalties (ch. 22, §§ 2200-2260). Defendant asserts that plaintiffs "provide no basis to pluck out particular sections, such as [the survival provision, section] 2010, and hold that the particular section applies but the rest of division 1 does not."

Under plaintiffs' view, if a foreign corporation were to challenge the application of any such California provision, a choice-of-law inquiry (see *ante*, fn. 5) would be triggered concerning each of the various ways in which California corporate law differs from that of other jurisdictions. Defendant contends that such a system would be unworkable,[22] and asserts that the Legislature could not have intended such a "radical change" and "bizarre regime."

---

[21]    Here and elsewhere we have, for consistency, altered the capitalization of "division" and related terms from that set out in the briefs.

[22]    Defendant argues that under such scheme, "foreign corporations would find themselves having to follow a litany of requirements regarding various corporate

*(footnote continued on next page)*

Additionally, defendant asserts, plaintiffs' interpretation of this key language "would render almost completely irrelevant the other provisions of chapters 1 through 20 that expressly apply to foreign corporations. (See [statutes cited *ante*, fn. 18].) For example, [section] 1501[, subdivision] (g), which pertains to annual reports to shareholders, states that the requirements apply to a certain subset of foreign corporations — those with their principal executive office in this state or that customarily hold board meetings in the state. The intended scope of [section] 1501 would be significantly altered by plaintiffs' interpretation of the code, again because *all* foreign corporations qualified to do business in California would fall within the ambit of division 1, including chapter 15, not just those foreign corporations with their principal office in this state or that customarily hold board meetings in this state." (Italics added.)

Finally, defendant argues that "[b]y making all of division 1 applicable to any foreign corporation qualified to do business in California, plaintiffs' proposal would render [section] 2115 [imposing certain California requirements, described *ante*, fn. 9, on pseudo-foreign corporations] largely superfluous." Defendant asserts: "[U]nder plaintiffs' interpretation . . . all the sections [covered by section 2115] would *already apply* to these foreign corporations because all such corporations would be considered 'organized under' division 1."

---

*(footnote continued from previous page)*

activities that their home state already regulates, creating innumerable, treacherous conflicts of law that the corporation would find impossible to navigate. For example, if a Delaware corporation wanted to amend its charter, engage in a merger, or declare a dividend, matters governed by both Delaware and California law, and the provisions of the two states differed as to these matters, the foreign corporation would have to engage in its own choice-of-law analysis to determine which states' law it needed to follow." (Citing § 500 and Del. Code Ann., tit. 8, § 170, setting forth different financial tests that must be satisfied for a corporation to be able to pay a dividend.)

Plaintiffs respond to these various points — and specifically, to defendant's overarching argument that the scheme envisioned by plaintiffs would subject *every* foreign corporation that qualified to do business in California to governance by *all* of division 1 and hence would be unworkable and could not have been contemplated by the Legislature — by contending that the code can be harmonized in a way that diminishes the problems identified by defendants. According to plaintiffs, the Legislature has created "three classes of foreign corporations that do business in California": (1) Corporations that engage in only occasional business in California, and hence are not subject to the "qualification" requirements of division 1, chapter 21 (§§ 2105-2107); (2) corporations that engage in successive and repeated business in California, and hence are subject to these statutory qualification requirements; and (3) so-called pseudo-foreign corporations that conduct the majority of their business, etc., in California, and are hence subject not only to these statutory qualification requirements, but also to the additional requirements imposed by section 2115. Plaintiffs assert: Corporations that fall into category (1) do not qualify as being "organized under" division 1, and hence they are not subject to its requirements. On the other hand, plaintiffs argue, corporations falling into categories (2) and (3) are indeed "organized under" division 1, and they are hence subject to the requirements of division 1, albeit in different ways. Plaintiffs postulate that corporations falling within category (2) — like defendant here — are governed by all of the requirements of division 1 (including the survival provision, § 2010), *subject to the outcome of a choice-of-law analysis* with regard to each California statutory provision that conflicts with a provision governing the corporation in its state of incorporation. By contrast, plaintiffs maintain, with regard to category (3), because section 2115's enumerated requirements apply "to the exclusion of the law of the jurisdiction in which it

is incorporated" (*id.*, subd. (b)), the various California requirements listed in that section (described *ante*, fn. 9) apply automatically, without being subjected to any choice-of-law analysis.[23]

As defendant observes, plaintiffs' expansive interpretation of section 102(a) would appear to render largely superfluous the various statutory provisions within division 1 that, pursuant to the third clause of section 102(a), specifically subject foreign corporations to their requirements. (See, e.g., statutes cited *ante*, fn. 18.) Under plaintiffs' interpretation, no "category (1)" corporation would ever be subject to such specifically extended requirements — thus nullifying the statutory extensions as to those corporations. And also under plaintiffs' interpretation, all "category (2)" corporations would *already* be automatically governed by those statutes — subject, of course, to choice-of-law analysis — thus rendering such specifically extended requirements essentially superfluous as applied to those corporations. And with regard to "category (3)" corporations — pseudo-foreign entities that are subject to the additional enumerated statutory requirements of section 2115 — they too would *already* be automatically governed by many of those statutes; moreover, as observed, *ante*, footnote 23, with regard to division 1 statutes not specifically enumerated in section 2115, pseudo-foreign corporations also would be governed by those additional statutes, subject to choice-of-law analysis.

We discern in the statutes no evidence that the Legislature intended by section 102(a) to accomplish the dramatic result ascribed to it by plaintiffs — essentially,

---

[23] Presumably, under plaintiffs' theory, with regard to this third category, other statutory requirements of division 1 not enumerated in section 2115 would, as with "category (2)" matters, be subject to the outcome of a choice-of-law analysis with regard to each California statutory provision that conflicts with a provision governing the corporation in its state of incorporation.

imposing on all "category (2)" foreign corporations that are qualified to undertake repeated and successive business in California, the burden of complying with *all* provisions of division 1, subject to what would often be a difficult choice-of-law analysis with regard to each California statutory provision that conflicts with a provision governing the corporation in its state of formation. As defendant suggests, such a scheme would require foreign corporations to "follow a litany of requirements regarding various corporate activities that their home state already regulates, creating innumerable, treacherous conflicts of law that the corporation would find impossible to navigate." (See *ante*, fn. 22.) We would expect the Legislature to have made its intentions clear had it intended to adopt such an elaborate and litigation-intensive scheme.

For these reasons we disagree with plaintiffs' assertion that foreign corporations like defendant, that have qualified under sections 2105-2107 to undertake "repeated and successive transactions of its business in this state" are thereby rendered "organized under" division 1, the General Corporation Law, and hence subject to its myriad provisions, including section 2010. Accordingly, we are disposed to reject plaintiffs' interpretation of section 102(a) and related statutes.

2. *The construction of the code by the majority in* North American II

As observed earlier, the majority in *North American II, supra,* 180 Cal.App.3d 902, reached a contrary conclusion based in part on its view of the proper interpretation of the statutory predecessor to the survival statute, section 2010 — Civil Code former section 399,[24] which was enacted in 1929 as part of a corporation law modernization

_____

[24]    Civil Code former section 399 read in relevant part: "All corporations, whether they expire by their own limitation, by forfeiture of charter by order of court, or are otherwise dissolved, shall nevertheless continue to exist for the purpose of winding up their affairs, prosecuting and defending actions by or against them, and of enabling them to collect and discharge obligations, to dispose of and convey their property, and to collect and divide their assets, but not for the purpose of continuing the business for

*(footnote continued on next page)*

project spanning 1929-1933.[25] Like section 2010, former section 399 of the Civil Code did not explicitly state whether it applied solely to domestic corporations or to both domestic and foreign corporations, and there is no indication that the Legislature specifically addressed that issue — even though an example for such an expansive

---

*(footnote continued from previous page)*

which the corporation was established. [¶] Any assets inadvertently or otherwise omitted from the winding up shall continue in the dissolved corporation for the benefit of the persons who would have been entitled thereto upon dissolution of the corporation, and on realization shall be distributed accordingly." (Stats. 1929, ch. 711, § 29, p. 1277.)

[25]     Sparked by an article — Ballantine, *Legislative Developments in Corporation Law* (1927) 15 Cal. L.Rev. 422 — the State Bar in 1928 proposed reform of California's corporation law, then housed in the Civil Code. The State Bar appointed a Committee on Revision of the Corporation Laws (State Bar Committee), which reviewed the statutes of other jurisdictions as well as the Uniform Business Corporation Act (1928) and other available sources. (See generally Ballantine, *Plans for a Modernized Incorporation Law* (1928) 16 Cal. L.Rev. 425; Ballantine, *Changes in California Corporation Laws (1929)* (1929) 17 Cal. L.Rev. 529; Sterling, *M o d e*]*ₙ* ET   3 *ₒ* W*ₒ* ]*ₙ* Th 3 *ₒ* ][*ₒ* ]*ₒ* ᵢ T*ₙ* ᴌ *ₒ* b *ᵥ* (1936) 12 Wisc. L.Rev. 453, 455-460 (Sterling).)

From the inception of the project it was understood that, for legal and practical reasons, the necessary amendments would have to be accomplished over successive legislative sessions — in 1929, 1931, and 1933. Those changes that could be enacted early in the process were so enacted. (Stats. 1929, ch. 711, §§ 1-43, pp. 1261-1287.) But some of the contemplated amendments could not be enacted by the Legislature until certain restrictive and outdated provisions of article XII of the Constitution, governing corporations, first were repealed or amended — which was accomplished in November 1930. (See generally Ballantine, Cal. Corporation Laws (1932) pp. 2-6, quoting the 1930 amendments and ballot arguments, and summarizing the changes, which did not affect art. XII, former § 15, discussed *post*, pt. II.C.3.) Thereafter, in phase two of the corporation law reforms, the bulk of the State Bar Committee's substantive changes were enacted in 1931. (Stats. 1931, ch. 862, §§ 1-3, pp. 1762-1835.) Finally, in 1933, the State Bar Committee proposed and the Legislature enacted "clean up" amendments to statutes and recent revisions. (Stats. 1933, ch. 533, §§ 1-96, pp. 1358-1420.) For these reasons, it is appropriate to view the corporation law amendments of 1929-1933 as a coordinated and synchronized package.

approach then existed in New Jersey, the state upon which California's survival statute was primarily modeled.[26]

In concluding that the former version of the survival statute should be interpreted to apply to both domestic and foreign corporations, the court in *North American II* relied in part on the fact that in 1929, when the section was enacted, former section 283 of the Civil Code provided that the provisions within its title applied to "*every private corporation*." (*North American II, supra,* 180 Cal.App.3d at p. 908, italics added.)

In order to understand what was meant by the phrase "every private corporation" in 1929 when the Legislature enacted former definitional section 283, along with former

---

[26]    According to the contemporaneous article, Ballantine, *Questions of Policy in Drafting a Modern Corporation Law* (1931) 19 Cal. L.Rev. 465, the California survival statute, by prolonging corporate life "for an indefinite period," was based "on the model of the New Jersey statutes" — as distinguished from the approach of other jurisdictions that placed a limit, typically three years, on the "continuation of a quasi-corporate existence" for dissolution and winding up. (*Id.*, at p. 483; see 2 Compiled Stats. N.J. (1911) Corporations, § 53, pp. 1634-1635, § 59, p. 1637 [P.L. 1896, pp. 295-296] [neither provision indicating whether it applied to foreign as well as domestic corporations].) In other words, the State Bar Committee drafters focused on whether the survival period should be open ended, or fixed by a period of years — but, apparently, they did not focus on the specific issue that we face now, whether the new survival statute would apply to foreign as well as domestic corporations.

Another provision of the New Jersey statutes addressed the issue we face now. When former section 399 of the Civil Code was enacted in 1929, a separate New Jersey statute provided: "*Foreign corporations doing business in this state shall be subject to the provisions of this act, so far as the same can be applied to foreign corporations.*" (2 Compiled Stats. N.J., *supra*, Corporations, § 96, p. 1657 [P.L. 1896, p. 307], italics added.) No similar provision was added in California, and the legislative history materials do not disclose that any such provision was considered. We also observe that New Jersey soon thereafter added a statutory provision expressly providing that a dissolved "domestic or foreign corporation . . . shall continue as a body corporate for the purpose of defending such suit." (1934 N.J. Laws ch. 159, p. 400; see N.J. Rev. Stat. § 14:13-14; *Dr. Hess & Clark, Inc. v. Metalsalts Corp.* (D.N.J. 1954) 119 F.Supp. 427 [so construing the subsequent N.J. statute].) Again, no such provision was added, or apparently considered, in California.

section 399, the predecessor to the survival statute, both as part of the Civil Code, that language must be read in the context of the definitions then existing. Former section 284 of the Civil Code remained unchanged by the 1929 legislation and specified that corporations were either "public" or "private": "Public corporations are formed or organized for the government of a portion of the State; all other corporations are private." (As amended by 1873-1874 Code Amdts., p. 197.) Significantly, Civil Code former section 285 — also amended in 1929 as part of that year's reform legislation package — had provided: "Private corporations may be formed by the voluntary association of any three or more persons *in the manner prescribed in this title* [that is, the General Corporation Law, Civil Code former section 283 et seq., setting out the conditions of and mechanisms for forming a corporation in California]. A majority of such persons must be residents of this state." (Civ. Code, former § 285, as amended by Stats. 1905, ch. 392, § 1, p. 502, italics added.)

From these provisions, all of which derived from substantively identical predecessor statutes dating from the early 1870s,[27] it appears that the phrase "every private corporation," as employed through 1929 and beyond, referred only to a domestic corporation — one formed under California statutes. Legislation passed in 1931, in the second phase of the coordinated modernization reforms, confirmed that definition.[28]

---

[27] See 1 Annotated Civil Code, sections 284 and 285 (1st ed. 1872, Haymond & Burch, commrs.-annotators) pages 83-85; 1 Annotated Civil Code, sections 284 and 285 (1st ed. 1874, Haymond & Burch, commrs.-annotators) pages 83-85.

[28] During that phase of the State Bar project to reform California's corporation statutes (see *ante*, fn. 25), many substantive changes were adopted. (Stats. 1931, ch. 862, §§ 1-3, pp. 1762-1835.) The Legislature added section 279 of the Civil Code, retaining language from prior statutes dating back to the early 1870s, specifying that the "provisions of this title are applicable to *every private corporation* . . . ." (Stats. 1931, ch. 862, § 2, p. 1765, italics added.) Significantly, the Legislature also added a new definitional section, Civil Code former section 278, that erased any possible doubt

*(footnote continued on next page)*

Indeed, a different and broader reading of the phrase "every private corporation" would have been inconsistent with the interpretation of similar language in other jurisdictions,[29] and with this court's application of the internal affairs doctrine, under which our state refrained from regulating the inner workings of foreign corporations (see, e.g., *post*, fn. 35).

Accordingly, contrary to the majority opinion in *North American II, supra*, 180 Cal.App.3d 902, 908, we do not infer that by specifying that the provisions of the General Corporation Law were applicable to " 'every private corporation,' " the Legislature in 1929 must have intended all of the various sections within that title to apply generally to both domestic *and* foreign business corporations. The inference we draw is the opposite — that the Legislature intended its general statutes governing domestic corporations should apply to foreign corporations only as specifically provided in those statutes.[30] It would have been unprecedented for the Legislature in 1929 to have intended otherwise.

---

*(footnote continued from previous page)*

concerning what was meant by the term "corporation": " 'Corporation,' unless otherwise expressly provided, *refers only to a domestic corporation*." (Stats. 1931, ch. 862, § 2, p. 1764, italics added.) The same section also specified: " 'Domestic corporation' means a corporation formed under the laws of this state, and 'foreign corporation' means any other corporation." By these amendments, the Legislature further clarified what was apparent when it enacted the first phase of corporation reform amendments, including the survival statute, in 1929: California's General Corporation Law applied to foreign corporations only as specifically provided in those statutes.

[29]  See, e.g., Comment, *Foreign Corporations f State Boundaries for National Business* (1949-1950) 59 Yale L.J. 737, 738 (reviewing past decisions and observing that "the statutory words 'every corporation' have often been construed as embracing only domestic corporations").

[30]  In the decades prior to 1929 the Legislature had exercised its authority by enacting statutes specifically extending certain burdens imposed on domestic corporations to foreign corporations. (See, e.g., *post*, fn. 36.) And in other situations, the Legislature apparently exercised its authority to refrain from extending such burdens, even in the face

*(footnote continued on next page)*

28

Finally, regarding the survival statute in particular, we note that the leading treatises stated, and the majority of out-of-state decisions of that era held, that a state's survival statute did not apply to foreign corporations.[31] A statute covering foreign as

---

*(footnote continued from previous page)*

of a decision by this court pointing out that the "Legislature alone" could make such an extension. (*South Yuba Water etc. Co. v. Rosa* (1889) 80 Cal. 333, 336-337.) We also note that in the course of its 1929-1933 coordinated reforms (see *ante*, fn. 25), the Legislature enacted a number of statutes that it specifically made applicable to foreign as well as domestic corporations. (See former provisions of Civ. Code, enacted by Stats. 1931, ch. 862, § 2, pp. 1795-1803 [former §§ 329 (allowing action against domestic and foreign corporations concerning lost or destroyed bonds), 330.21, subd. (a) (the term "shares" under the Stock Transfer Act applied to "shares of stock in a domestic or foreign corporation"), & 345 (general provision concerning ultra vires acts "shall extend to contracts . . . made by foreign corporations in this state")]; Stats. 1933, ch. 533, § 23, p. 1371 [former § 315 (procedures for determining the validity of election or appointment in California of "any director of any domestic corporation, or of any foreign corporation"); Stats. 1933, ch. 533, § 26, p. 1372 [former § 320b, subd. (4) (procedures for voting of shares in the name of "a corporation, domestic or foreign")]; Stats. 1933, ch. 533, § 33, p. 1377 [former § 328e (granting domestic and foreign corporations immunity from liability concerning transfer of shares by minors)]; Stats. 1933, ch. 533, § 54, p. 1388 [former § 355 (shareholders' inspection of records of domestic and foreign corporations)]; Stats. 1933, ch. 533, § 55, p. 1388) [former § 356 (director's inspection of records of domestic and foreign corporations)]; Stats. 1933, ch. 533, § 58, p. 1390 [former § 359 (requiring provision of financial statements to shareholders of domestic corporations and "foreign corporations having the principal place for the transaction of their business in this State or customarily holding meetings of their boards of directors therein")].) As noted, Civil Code former section 399 did not expressly apply to foreign corporations.

[31]    According to the leading treatise of the day — Fletcher, Cyclopedia of the Law of Private Corporations (as updated by then-current supplements) — the clear majority rule was that a state's survival statute applied only to that state's domestic corporations, and not to foreign corporations. (See *id.*, vol. 8 (1919) § 5616, p. 9212 ["These statutes which prevent abatement [of suits against corporations] upon dissolution do not apply to foreign corporations"]; *id.*, §§ 5628, 5629, p. 9221 [even though states' survival statutes are often applicable to "all" corporations, "such statutes do not apply to foreign corporations, it is *generally* held" (italics added)]; *id.*, § 5819, p. 9719 ["By the weight of authority, it is held that such a statute has no application to foreign corporations"]; see

*(footnote continued on next page)*

well as domestic corporations would have placed California outside the clear majority rule. In light of the national scope of the comprehensive review that preceded the legislation (see *ante*, fn. 25), if our Legislature had contemplated such a dramatic change from the majority approach, we would expect it to have been clear in doing so.[32]

---

(footnote continued from previous page)

also 3 Cook on Corporations (8th ed. 1923), ch. XXXVIII, § 642, pp. 2402-2403 ["A statute that corporations shall continue for a certain time after their dissolution for purposes of litigation does not apply to foreign corporations"].)

The minority view was acknowledged and criticized in Beale, The Law of Foreign Corporations (1904) section 828, pages 989-990: "It may be claimed that a statute permitting a corporation to sue and be sued for a certain time after dissolution applies to a foreign corporation, and that such corporation, though dissolved in its own State, may nevertheless be party to a suit by virtue of the statute. In a few jurisdictions the statute is interpreted as applying to foreign corporations, *though the better view would seem to be that it applies to domestic corporations only*." (Fns. omitted, italics added.) The treatise acknowledged that a statute adopting the minority view would be constitutional. (*Id.*, at p. 990, citing *McGoon v. Scales* (1869) 76 U.S. 23.)

Representative cases predating the late 1920s, reflecting the majority rule (that the survival statute did not cover foreign corporations), include the following: *L Te Lɪ h ɒ ɟ America v. Goode* (Tex. 1888) 8 S.W. 639; *Marion Phosphate Co. v. Perry* (5th Cir. 1896) 74 F. 425 (applying Fla. Law); *Dundee Mortgage & Trust Investment Co. v. Hughes* (C.C. Or. 1898) 89 F. 182 (applying Or. law); *Fitts v. National L Te Lɪ h* (Ala. 1900) 30 So. 374; *Harris-Woodbury Lumber Co. v. Coffin* (C.C.W.D.N.C. 1910) 179 F. 257 (applying N.C. law); *Riddell v. Rochester German Ins. Co. of New York* (R.I. 1912) 85 A. 273; *Martyne v. American Union Fire Ins. Co. of Philadelphia* (N.Y. 1915) 110 N.E. 502. Cases predating the late 1920s, reflecting the minority position that a survival statute covered foreign corporations, include the following: *Stetson v. City Bank of New Orleans* (1853) 2 Ohio St.Rep. 167; *Life Association of America v. Fassett* (1882) 102 Ill. 315; *Hauger v. International Trading Co.* (Ky.Ct.App. 1919) 214 S.W. 438.

[32] That the Legislature did not so intend is further demonstrated by one of the various "clean-up" amendments recommended by the State Bar Committee drafters, and adopted by the Legislature, in the third phase of modernization reforms in 1933. (Stats. 1933, ch. 533, pp. 1358-1420; see generally Ballentine, *Amendments of the California General Corporation Law* (1933) 8 State Bar J. 136.) Among those revisions was a slight change to the opening words of the survival statute, Civil Code, former section 399. Whereas the 1929 and 1931 versions commenced by specifying that the provision applied to "All

(footnote continued on next page)

3. *Even if the statutes do not make fo ]o T n c n ][ o i T nx subject to 3 a W o ]n T h survival statute ( does 3 a W o ]n T h 3 o n s i T u t T n update iSut so e result?*

Plaintiffs insist that if, as above, we reject their statutory construction argument that defendant was "organized under" division 1 and for that reason is subject to section 2010, that statute "still applies to [defendant]" under the compulsion of article XII, former section 15 of the California Constitution. As noted earlier, that constitutional provision, which was repealed by the electorate in 1972, provided that corporations "organized outside the limits of this State" — e.g., foreign corporations — "shall [not] be allowed to transact business" in this state "on more favorable conditions than" corporations "organized under the laws of this State." (Cal. Const., art. XII, former § 15; hereafter article XII, former section 15.) Plaintiffs concede that their constitutional argument, which they present as an "alternative" to their statutory contention, is somewhat in tension with it — in that each depends on a different understanding of the term "organized" — but they insist that it stands as an independent reason for this court to reverse the decision below.

Underlying plaintiffs' argument are two premises: (1) pursuant to article XII, former section 15, the "original meaning" of the survival statute in 1929 (and thereafter) was that it covered both domestic and foreign corporations (otherwise foreign corporations would "be allowed to transact business" in this state "on more favorable conditions than" domestic corporations); and (2) accordingly, the repeal of article XII,

---

*(footnote continued from previous page)*

corporations," the 1933 version — adopting the language that is still used today in section 2010 — changed the opening sentence to read, "A corporation . . . ." In context, this change appears to have been intended to further clarify that the survival statute applied, not literally to all corporations, but instead to corporations as defined elsewhere in the statutes — that is, to domestic corporations only.

former section 15 in 1972 did not alter that asserted original reach of the survival statute; instead, the constitutional provision lives on, at least insofar as the survival statute is concerned. In advancing these arguments plaintiffs endorse the position of the appellate court majority in *North American II, supra*, 180 Cal.App.3d 902, and fault the decision of the appellate court below, and defendant's brief, for failing to "analyze, let alone refute, *North American II*'s constitutional analysis."

It is true that the decision below failed to grapple with the *North American II* majority's constitutional analysis, and indeed defendant's brief addresses that issue only cursorily. But having examined that matter ourselves, we conclude that plaintiffs, and the majority in *North American II*, have not properly construed the former constitutional provision. As we will explain, *North American II* misinterpreted article XII, former section 15, when it read that section as intending to provide that every statutory restriction or requirement that the Legislature imposes upon a domestic corporation also must be imposed upon a foreign corporation. Instead, the former constitutional provision, properly interpreted, simply prohibited the Legislature from explicitly granting a privilege or benefit to a foreign corporation that was withheld from domestic corporations — for example by permitting only a foreign corporation, and not domestic corporations, to engage in a particular business or in a particular location.

Article XII, former section 15, was drafted and adopted by the delegates to the constitutional convention of 1878-1879[33] and endorsed by the voters later that year when they approved the new Constitution. As noted, the provision read: "No corporation organized outside the limits of this State shall be allowed to transact business within this

---

[33]     See 1 Willis & Stockton, Debates and Proceedings of the Constitutional Convention of the State of California (1878-79) (1880) pages 250 and 426 (initial proposals of provision); 3 Willis & Stockton, *supra*, at page 1217 (as amended); *id.*, at page 1521 (as adopted).

State on more favorable conditions than are prescribed by law to similar corporations organized under the laws of this State."[34]

From an early time our cases construing and applying article XII, former section 15, concluded that the provision had no application to state statutes that regulated the "internal affairs" of corporations. As to those matters, the cases held that, under the internal affairs doctrine, a foreign corporation was subject to only the law of its state of incorporation.[35] In other contexts, cases of that era cited article XII, former section 15

---

[34] There had been no similar provision in the prior state Constitution of 1849. By one contemporaneous account, the provision was inspired by a somewhat similar provision of the 1874 Arkansas Constitution. (Desty, The Constitution of the State of California Adopted in 1879, With References to Similar Provisions of the Constitutions of Other States (1893) p. 328 [copyright 1879; indicating that the provision was related to "Ark. XII, 11"].)

Actually, the Arkansas provision appears to have been considerably broader than that enacted by California. Article XII, section 11 of the Arkansas Constitution, as adopted in 1874, read: "Foreign corporations may be authorized to do business in this State, under such limitations and restrictions as may be prescribed by law; Provided: That no such corporation shall do any business in this State, except while it maintains therein one or more known places of business, and an authorized agent or agents in the same, upon whom process may be served; and, *as to the contracts made or business done in this State, they shall be subject to the same regulations, limitations and liabilities as like corporations of this State: and shall exercise no other or greater powers, privileges or franchises than may be exercised by like corporations of this State*; nor shall they have power to condemn or appropriate private property." (Italics added.) Although by the late 1920s a handful of other jurisdictions had constitutional provisions very similar to California's, they all postdated article XII, former section 15, and appear to have been modeled on it.

[35] In *Miles v. Woodward* (1896) 115 Cal. 308, this court held that a statute requiring filing and posting of weekly reports was not unconstitutional under article XII, former section 15, merely because it imposed its burdens on domestic, and not foreign, corporations. This court wrote that despite the constitutional provision, "[t]he laws of the state do not have extraterritorial force. It would be meaningless for this state to try to legislate upon the internal affairs of such foreign corporations, and it has not attempted to do so." (*Miles,* at p. 311; accord, *Western Union Tel. Co. v. Superior Court* (1911) 15 Cal.App. 679, 694 [the formation, organization, stock, and subscriptions requirements

*(footnote continued on next page)*

33

most often in discussing and applying California statutes that, by their terms, applied similar restrictions on both domestic and foreign corporations. For example, a series of cases discussed the former constitutional provision when applying a statute imposing a "stockholder liability" burden on stockholders of both domestic and foreign corporations.[36] The court concluded in each case that the statutory burden properly applied to stockholders of both types of corporations.[37] None of these decisions suggested that article XII, former section 15, would *by itself* render stockholders of foreign corporations subject to such a liability burden.

In *Conference Free Baptists v. Berkey* (1909) 156 Cal. 466 (*Berkey*), this court held that the constitutional provision did not apply in the case of a one-time business transaction. In the course of our analysis we discussed whether article XII, former

---

*(footnote continued from previous page)*

governing domestic corporations are not, by virtue of art. XII, former § 15, applicable to foreign corporations — and this does not amount to allowing foreign corporations to transact business on terms more favorable than domestic corporations]; see also *Southern Sierras Power Co. v. Railroad Commission of California* (1928) 205 Cal. 479 [reaffirming a robust application of the internal affairs doctrine without even mentioning art. XII, former § 15].)

36    See Civil Code former section 322 ("Each stockholder of a corporation is individually and personally liable for such proportion of all its debts and liabilities contracted or incurred during the time he was a stockholder as the amount of stock or shares owed by him bears to the whole of the subscribed capital stock or shares of the corporation."). Such statutory liability was compelled by the 1879 California Constitution's article XII. This constitutional underpinning was among the matters repealed by the constitutional amendment of 1930 (see *ante*, fn. 25; Sterling, *supra*, 12 Wisc. L.Rev. 453, 456-457), and the statute itself was repealed in Statutes 1931, chapter 257, section 1, page 444.

37    See *Pinney v. Nelson* (1901) 183 U.S. 144; *Peck v. Noee* (1908) 154 Cal. 351; *Thomas v. Wentworth Hotel Co.* (1910) 158 Cal. 275; *Provident Gold Mining Co. v. Haynes* (1916) 173 Cal. 44.

section 15, in addition to barring the Legislature from enacting statutes that granted

foreign corporations benefits or privileges not afforded to domestic corporations, also

was " 'self-executing' " in the sense that it automatically imposed on foreign corporations

general statutory burdens that were imposed on domestic corporations.[38] We stated in

dictum that whether the provision was self-executing in this sense was "a question which

may be open to doubt." (*Berkey, supra,* at p. 468.) In this regard we cited cases strongly

supporting such doubt by finding the corresponding provision of the Montana

Constitution did not automatically impose on foreign corporations the same burdens

imposed by statute on domestic corporations.[39] This prompted a leading commentator to

---

[38]    The court in *Berkey* recognized that the provision was " 'self-executing' " in the
first sense described above: Without need for any implementing legislation, the
provision prohibited "the passing of laws affirmatively giving superior privileges to
foreign corporations." (*Berkey, supra,* 156 Cal. at p. 468.) If the Legislature had enacted
such a statute, the statute would have been unconstitutional under article XII, former
section 15, because of the constitutional provision itself and would have been struck
down by a court if challenged. No statute was needed to implement the constitutional
prohibition in this respect.

[39]    In *Uihlein v. Caplice Commercial Co.* (Mont. 1909) 102 P. 564, the Montana
Supreme Court, construing that state's somewhat similar counterpart to our article XII,
former section 15, concluded that the Montana provision was "[p]rimarily . . . addressed
to the legislative assembly" and "was intended to prohibit the passage of laws giving to
foreign corporations the right to exercise or enjoy any greater privileges than those
possessed or enjoyed by domestic corporations," not "to bring foreign corporations
within the provisions of a law intended to apply solely to domestic corporations."
(*Uihlein v. Caplice Commercial Co., supra,* at p. 568.) Similarly, in *First NathWBank v.
Weidenbeck* (8th Cir. 1899) 97 F. 896, the court rejected an argument that the Montana
constitutional provision required foreign corporations to comply with all forum state rules
applicable to its domestic corporations, stating that such a result would be "untenable"
and hence "[i]t is never done": "in the very nature of things, it is impossible to provide
exactly the same system of laws for foreign as for domestic corporations." (*Id.,* at
p. 900.) Instead, the court held, the constitutional provision is simply "an inhibition
against the grant of powers and privileges to foreign corporations that are not granted to,
or cannot be enjoyed by, domestic corporations under like conditions." (*Ibid.*)

say that our decision in *Berkey* "intimated, but [did] not decide[], . . . that this provision of the constitution is not self-executing . . . ." (*Clarke*, Cal. Corporation Law (1916) ch. XXXIV, pp. 608-609.)

Based on this history, we disagree with the implicit assumption of the majority in *North American II* that in 1929, when the survival statute was enacted, the general understanding was that article XII, former section 15, meant that all statutory burdens imposed on domestic corporations also would apply to foreign corporations — even if the particular statute did not specify that it would apply to foreign as well as domestic corporations. *Berkey, supra*, 156 Cal. 466, decided in 1909, demonstrates that it was not at all clear in 1929 that the former constitutional provision had the effect attributed to it in 1986 by the appellate court in *North American II*. Accordingly, even if we apply the doctrine that ambiguous statutory provisions should be interpreted to avoid constitutional problems, we cannot endorse the implicit conclusion of the court in *North American II* that such an interpretation of the 1929 survival statute was or is required.[40] In view of the language of the current statutory provisions and the deliberate changes made to them throughout the years, as well as the legislative and constitutional background against which the predecessor of section 2010 was enacted, we conclude that the survival statute should properly be interpreted to apply to domestic corporations only.

### D. *Dicta in our cases*

Against this conclusion plaintiffs highlight dicta in two of our decisions — *Penasquitos, supra,* 53 Cal.3d 1180, and *McCann v. Foster Wheeler LLC* (2010) 48

---

[40]  Having concluded that the court in *North American II* misinterpreted the meaning and effect of article XII, former section 15, we need not address the circumstances surrounding the repeal of former constitutional provision in 1972. Because that former provision is not a proper basis for interpreting the former or current versions of the survival statute as applying to both domestic and foreign corporations, that former provision is not relevant to the issue before us — and its repeal is similarly irrelevant.

Cal.4th 68 (*McCann*) — in which we cited and described the conclusion of *North American II, supra,* 180 Cal.App.3d 902, that the survival statute, section 2010, applies to foreign corporations. Plaintiffs assert that in doing so we tacitly approved the reasoning of *North American II.*

In *Penasquitos, supra,* 53 Cal.3d 1180, we held that section 2010 permitted not only the *continuation* of suits against dissolved domestic corporations, but also the *initiation* of suits against dissolved domestic corporations. In support we cited out-of-state-cases so construing similar statutes, and we also quoted both prior *North American* decisions for the proposition that under section 2010, " 'there is no time limitation for suing a dissolved corporation for injuries arising out of its predisposition activities.' " (*Penasquitos, supra,* at pp. 1187-1188, quoting *North American I, supra,* 128 Cal.App.3d at p. 143, and *North American II, supra,* 180 Cal.App.3d at p. 904.) In the course of reciting the history of the *North American II* litigation, we mentioned in passing that the appellate court in that latter case had reconsidered its earlier determination that foreign corporations were not covered by section 2010, and had concluded instead that they are covered by that survival statute. (*Penasquitos, supra,* at p. 1188.) Because, as noted, *Penasquitos* did not concern a foreign corporation, we did not consider, much less resolve, whether section 2010 applies to such corporations, and thus the decision does not assist plaintiffs.

*McCann, supra,* 48 Cal.4th 68, which concerned a suit for asbestos-related injuries against an existing (not dissolved) foreign corporation, is similarly unhelpful to plaintiffs. In that decision we applied traditional choice-of-law principles; the case had nothing to do with, and did not even mention, section 2010, the survival statute. Applying the "comparative impairment" prong of the three-part governmental interest choice-of-law test (see *ante,* fn. 5) on the facts presented in *McCann* — involving conduct occurring outside California, and a foreign law that limited liability for such conduct engaged in by the defendant within the foreign state's territory — we concluded that the interest of the

foreign jurisdiction in enforcing its own liability-limiting law was paramount, and the interest of California in enforcing its own law was properly subordinated. (*McCann, supra,* at p. 101.) In reaching this determination, we stressed that on different facts — as when a defendant "is responsible for exposing persons to the risks associated with asbestos or another toxic substance through its conduct *in California*," the conclusion under the comparative impairment inquiry would likely be different, and "would allocate to *California* the predominant interest in regulating the conduct." (*Ibid.*) In support, we cited, as an example, *North American II, supra,* 180 Cal.App.3d at pages 907-908, and described that decision in a parenthetical as "holding California law applicable when the plaintiff was exposed to asbestos in California by a company incorporated in another state, where plaintiff's action against the company would have been barred as untimely under the other state's law." (*McCann, supra,* at p. 101.) Clearly, the import of our citation to *North American II* was to its choice-of-law analysis, which we implicitly approved on its own terms; but we did not consider the issue we face today, whether a foreign corporation is subject to our state's survival statute. Again, this dictum — especially when viewed in light of the extensive history discussed *ante,* part II.C.3. — does not assist plaintiffs.

### E. *Policy considerations*

Plaintiffs highlight defendant's history of transacting business in California from the 1930s through the 1980s, when it surrendered its certificate of qualification. They assert that defendant, having been dormant for nearly two decades, strategically filed for dissolution in Delaware in 2005 in order to cut off its continuing liability (and recovery of damages through applicable "undistributed . . . insurance assets" — see § 2011, subd. (a)(1)(A)) to asbestos victims. Plaintiffs argue that this course of conduct "directly contravenes California policy. When foreign corporations seek and accept the benefits of transacting business here, California law *should not* allow them to use their home state's corporate-friendly laws to deprive California citizens of their remedies." (Italics added.)

38

The policy question concerning whether the provisions of California's survival statute *should* apply to foreign as well as domestic corporations is properly a matter to be determined by the Legislature, not this court. Because the Legislature has left the holding of *North American II, supra*, 180 Cal.App.3d 902, untouched since 1986, it might be argued that section 2010 reflects the Legislature's acquiescence concerning what California law should provide. But as explained above, the history and language of the statutes simply do not support the proposition that section 2010, at its inception or today, governed or governs foreign in addition to domestic corporations.

### III. *Conclusion*

We conclude that California's survival statute, section 2010, does not apply to foreign corporations, and we disapprove *North American II, supra*, 180 Cal.App.3d 902, to the extent it held otherwise. Having reached this decision, we need not perform a choice-of-law comparative-impairment analysis in order to determine which state's law should apply. (See *ante*, fn. 5.)

The judgment of the Court of Appeal is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Greb v. Diamond International Corporation

---

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 184 Cal.App.4th 15
**Rehearing Granted**

---

**Opinion No.** S183365
**Date Filed:** February 21, 2013

---

**Court:** Superior
**County:** San Francisco
**Judge:** Peter J. Busch

---

**Counsel:**

Law Office of Ted W. Pelletier, Ted W. Pelletier; Clapper, Patti, Schweizer & Mason, Jack K. Clapper, Steven J. Patti and Christine A. Renken for Plaintiffs and Appellants.

Murchison & Cumming, Edmund G. Farrell III, Scott L. Hengesbach and Maria A. Starn for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ted W. Pelletier
Law Office of Ted W. Pelletier
22 Skyline Road
San Anselmo, CA 94960
(415) 454-8783

Edmund G. Farrell III
Murchison & Cumming
801 South Grand Avenue, 9th Floor
Los Angeles, CA 90017
(213) 623-7400

# EXHIBIT B



BURNS INDIANA STATUTES ANNOTATED
Copyright © 2012 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

***Statutes current through Act P.L. 161 of the 2012 Second Regular Session***
***Annotations current through July 31, 2012 for Indiana Supreme Court cases, through September 6, 2012 for Indiana Appellate Court cases, through September 7, 2012 Indiana Tax Court cases, and through September 6, 2012 for Federal court cases.***

Title 23  Business And Other Associations
Article 1  Business Corporations -- Types
Chapter 45  Voluntary Dissolution

**Go to the Indiana Code Archive Directory**

*Burns Ind. Code Ann. § 23-1-45-1*  (2012)

**23-1-45-1.  Prior to issuing shares or commencing business.**

A majority of the incorporators or initial directors of a corporation that has not issued shares or has not commenced business may dissolve the corporation by delivering to the secretary of state for filing articles of dissolution that set forth:

(1) The name of the corporation;

(2) The date of its incorporation;

(3) Either:

(A) That none of the corporation's shares has been issued; or

(B) That the corporation has not commenced business;

(4) That no debt of the corporation remains unpaid;

(5) That the net assets of the corporation remaining after winding up have been distributed to the shareholders, if shares were issued; and

(6) That a majority of the incorporators or initial directors authorized the dissolution.

**HISTORY:** P.L.149-1986, § 29.

**NOTES:**

**Indiana Comment**

Under the GCA, a "short-form" dissolution was possible only if the corporation had not issued any shares and had not commenced business. *See  IC 23-1-7-1(a)* (repealed 1986). The BCL permits short-form dissolution if either one of these conditions is satisfied. This method of dissolution is likely to be used by "name-holding" corporations or by corporations that were formed for the initiation of a new venture but the reasons for the initial creation of the corporation have been completely realized or will never come to fruition.

The required provisions of articles of dissolution provided in this section take account of the fact that a corporation may utilize this section even though it has received capital from the issuance of shares or has incurred liabilities either from the commencement of business without issuing shares or from its organization; hence the articles must state that no debts remain unpaid, and the net assets of the corporation remaining after winding up have been distributed to the shareholders.

Even though a dissolving corporation may not have commenced business or acquired a tax identification number, it must still give notice of the dissolution to the Indiana Department of Revenue, under *IC 6-8.1-10-9*, the Indiana Department of Workforce Development, under *IC 22-4-32-23* and the Unclaimed Property Division for the Indiana Attorney General, under *IC 32-34-1-25*.

**LexisNexis 50 State Surveys, Legislation & Regulations**

Dissolution & Liquidation of General Business Forms

**Notes to Decisions**
Actions.

**Actions.**

Where a corporation, after having fully performed its contract with a city for the construction of a public improvement, was dissolved, one succeeding to its matured right of action on the contract, as provided by Acts 1913, p. 634, authorizing its dissolution, was entitled to maintain an action to enforce that right notwithstanding a provision in the contract that there could have been no assignment thereof without the consent of the city's board of public works. *Laporte v. Ahlborn, 191 Ind. 485, 133 N.E. 874, 1922 Ind. LEXIS 8 (1922).*

A demurrer could not be sustained to complaint on ground that complaint showed that corporation against which the action was brought was dissolved. *Seaney v. Ayres, 135 Ind. App. 585, 189 N.E.2d 826, 1963 Ind. App. LEXIS 273 (1963).*

**Research References**

**Indiana Law Journal.**

Overt and Covert Bailouts: Developing a Public Bailout Policy, *67 Ind. L.J. 951 (1992).*

**Indiana Law Review.**

Origin, Development, and Current Status of Fiduciary Duties in Close Corporations: Has Indiana Adopted a Strict Good Faith Standard?, *26 Ind. L. Rev. 1215 (1993).*

**Collateral References.**

Dissolved corporation's power to participate in arbitration proceedings. *71 A.L.R.2d 1121.*

Preferred stockholder's rights, upon liquidation or dissolution, to dividends. *25 A.L.R.2d 788.*

Stockholder's rights to patent, copyright, or trademark owned by corporation on dissolution thereof. *30 A.L.R.2d 938.*



BURNS INDIANA STATUTES ANNOTATED
Copyright © 2012 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

***Statutes current through Act P.L. 161 of the 2012 Second Regular Session***
***Annotations current through July 31, 2012 for Indiana Supreme Court cases, through September 6, 2012 for Indiana Appellate Court cases, through September 7, 2012 Indiana Tax Court cases, and through September 6, 2012 for Federal court cases.***

Title 23   Business And Other Associations
Article 1   Business Corporations -- Types
Chapter 45   Voluntary Dissolution

**Go to the Indiana Code Archive Directory**

*Burns Ind. Code Ann. § 23-1-45-7*   (2012)

**23-1-45-7.  Publication of notice.**

(a) A dissolved corporation may also publish notice of its dissolution and request that persons with claims against the corporation present them in accordance with the notice.

(b) The notice must:

(1) Be published one (1) time in a newspaper of general circulation in the county where the dissolved corporation's principal office (or, if none in Indiana, its registered office) is or was last located;

(2) Describe the information that must be included in a claim and provide a mailing address where the claim may be sent; and

(3) State that a claim against the corporation will be barred unless a proceeding to enforce the claim is commenced within two (2) years after the publication of the notice.

(c) If the dissolved corporation publishes a newspaper notice in accordance with subsection (b), the claim of each of the following claimants is barred unless the claimant commences a proceeding to enforce the claim within two (2) years after the publication date of the newspaper notice:

(1) A claimant who did not receive written notice under section 6 [*IC 23-1-45-6*] of this chapter.

(2) A claimant whose claim was timely sent to the dissolved corporation but not acted on.

(3) A claimant whose claim is contingent or based on an event occurring after the effective date of dissolution.

(d) A claim may be enforced under this section:

(1) Against the dissolved corporation, to the extent of its undistributed assets; or

(2) If the assets have been distributed in liquidation, against a shareholder of the dissolved corporation to the extent of the shareholder's pro rata share of the claim or the corporate assets distributed to the shareholder in liquidation, whichever is less, but a shareholder's total liability for all claims under this section may not exceed the total amount of assets distributed to the shareholder.

**HISTORY:** P.L.149-1986, § 29; P.L.75-1990, § 3.

**NOTES:**

### Indiana Comment

Subsections (b)(3) and (c) establish a two-year statute of limitations for claims to which notice is given under section 7, rather than the five-year limitations period provided in RMA § 14.07(b)(3) and (c).

The claim period under the Model Business Corporation Act is three years. See MODEL BUSINESS CORP. ACT § 14.07 (2003). The RMA's lengthy limitations period reflects a concern that contingent claims might arise long after dissolution is completed and the dissolving corporation's remaining assets have been distributed to its shareholders. *See* MODEL BUSINESS CORP. ACT § 14.07 (1985). The Commission believed, however, that the RMA gives insufficient weight to the countervailing concern of exposing directors, officers and shareholders of the dissolving corporation to uncertain liability for a protracted period. Accordingly, the Commission recommended retaining the two-year limitations period of the GCA, *See IC 23-1-7-1(e)(1)* (repealed 1986), as striking a more reasonable balance between these conflicting concerns.

If the dissolving corporation takes advantage of *IC 23-1-45-6*'s optional procedure for disposing of known claims, this two-year limitations rule will apply only to unknown or contingent claims; if not, it will apply to all claims. The two-year statute of limitations established by the GCA, which had no special procedure for earlier disposition of known claims, applied to all claims against a dissolving corporation. *See IC 23-1-7-1(e)(1)* (repealed 1986).

### LexisNexis 50 State Surveys, Legislation & Regulations

Dissolution & Liquidation of General Business Forms

### Notes to Decisions
Construction. Relation to Federal Law.

#### Construction.

As a survival statute, this section must be narrowly construed, and equitable remedies do not apply to defeat it; consequently, nothing in the Underground Storage Tank Act, IC 13-23-1, counters the narrow limitations set forth in this survival statute. *Lovold Co. v. Galyan's Brownsburg, Inc., 764 N.E.2d 281, 2002 Ind. App. LEXIS 339 (2002).*

In an action brought under the Comprehensive Environmental Response, Compensation and Liability Act by trustees of a trust fund for a Superfund site, an insurer was not entitled to summary judgment on the ground that the trustees' claims against it and other insurance companies were not viable based on the fact that the trustees' claims against the insured corporation were time-barred under *IC 23-1-45-7* because the corporation was not entitled to benefit of the two-year statute of limitations provided in *IC 23-1-45-7(b)(3)*, (c), as it had been administratively dissolved pursuant to IC 23-1-46, not voluntarily dissolved. *Bernstein v. Bankert, -- F. Supp. 2d --, 2010 U.S. Dist. LEXIS 24329 (2010).*

#### Relation to Federal Law.

Some of the claims asserted by a property owner in a private suit brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act were dismissed because they were time-barred under *IC 23-1-45-7* because: (1) the owner was attempting to recover environmental cleanup costs from prior owners of the property; (2) one of those prior owners was a business, which was voluntarily dissolved and ceased to exist in 1990; (3) *IC 23-1-45-7* imposed a two year statute of limitations for asserting claims against dissolved corporations; (4) *IC 23-1-45-7* applied to bar not only the owner's claims against the dissolved business, but also against that business's insurers; and (5) CER-CLA did not trump state law, which pursuant to *Fed. R. Civ. P. 17(b)* was determinative of the business's capacity to sue and be sued. *Sanyo N. Am. Corp. v. Abscocold Corp., -- F. Supp. 2d --, 2008 U.S. Dist. LEXIS 18700 (2008).*

In an action filed under the Comprehensive Environmental Response, Compensation, and Liability Act, a motion to dismiss was denied because, even though a complaint was filed more than two years from the date of a corporate dissolution, a corporation did not publish notice of its dissolution in a newspaper of general circulation, as required by *IC 23-1-45-7(b)*. The limitations bar did not begin to run until after notice was published. *United States v. Arg Corp., -- F. Supp. 2d --, 2011 U.S. Dist. LEXIS 9770 (2011).*

**Cited:**

*Schmalhausen Siebert Chevrolet Oldsmobile, Inc. v. Bass, 554 N.E.2d 1180, 1990 Ind. App. LEXIS 671 (1990).*

**CERTIFICATE OF SERVICE**

*Haskins et al v. Cherokee Investment Partners, LLC, et al.,*

USDC – Northern District Court Case No. 3:11-cv-05142JST

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 333 Bush Street, Suite 1100, San Francisco, California, 94104. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On March 15, 2013, I served the following document:

**DECLARATION OF ROBERT W. FARRELL IN SUPPORT OF MOTION BY , DEFENDANT FULLER O'BRIEN INC. TO SET ASIDE DEFAULT AND DISMISS ACTION PURSUANT TO FRCP RULE 12(b)(5)**

I served the document on all parties in this matter by CM/ECF. The document was served via CM/ECF (all parties are registered for CM/ECF):

I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct.


Dated: March 15, 2013          _____/s/ Maureen Liu_____

                                  Maureen Liu

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4842-6229-6595.1          3          CV-11-05142-JST

DECLARATION OF ROBERT W. FARRELL IN SUPPORT OF MOTION BY DEFENDANT FULLER O'BRIEN INC. TO SET ASIDE DEFAULT AND DISMISS ACTION